[No. S128854. July 10, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDREW VASQUEZ et al., Defendants and Appellants.

**COUNSEL**

Nancy J. King, under appointment by the Supreme Court, for Defendant and Appellant Andrew Vasquez.

Sylvia Whatley Beckham, under appointment by the Supreme Court, for Defendant and Appellant Anthony Fregoso.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Kristofer Jorstad, Victoria B. Wilson, Steven D. Matthews, Mary Sanchez and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—Does the erroneous denial of a defendant's motion to disqualify the prosecuting district attorney's office for a conflict of interest (Pen. Code, § 1424) constitute a deprivation of due process? We conclude that not all erroneous denials under Penal Code section 1424 result in due process violations; we further conclude the participation of a conflicted prosecutor in this case did not do so. We therefore reject defendants' contention that the Court of Appeal erred in failing to assess the prejudice flowing from constitutional error. We further conclude that the trial court's failure to disqualify the prosecutor in this case, an error under Penal Code section 1424, was not prejudicial under the standard of *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].

### FACTUAL AND PROCEDURAL BACKGROUND

Defendants Andrew Vasquez and Anthony Fregoso were charged with the murder of Armando Ayala, with allegations Vasquez personally used a knife and Fregoso personally used a baseball bat in the crime. (Pen. Code, §§ 187,

12022, subd. (b)(1).)[1] After a joint trial, both defendants were found guilty of second degree murder, the use allegations were found true, and they were each sentenced to 16 years to life in prison.

The facts of the offense are not important to the issues we address here. As summarized by the Court of Appeal (neither party disputes the lower court's accuracy), the trial testimony showed, in brief, the following: Defendants and the victim belonged to rival "tagging crews." On the day before the offense, Ayala (the victim) and two other young men hit, kicked, and sprayed a young woman in the face with Mace, warning her against interfering with their crew. The young woman told Fregoso of the attack, and the next day, apparently in retaliation, defendants approached Ayala near the entrance to Fairfax High School. As Fregoso positioned himself in front of Ayala, Vasquez approached him diagonally from behind, holding something (some witnesses saw a knife) in his hand. Warned by a friend, Ayala turned and sprayed pepper spray as Vasquez, with a side-arm motion, stabbed him in the chest with a knife. The wound, which severed an artery and penetrated Ayala's lung, was fatal.

The motion to disqualify the district attorney's office arose from the family relationship between defendant Vasquez and two employees of the Los Angeles County District Attorney (LACDA). According to Vasquez's trial counsel, and undisputed by the People, Vasquez's mother had been, at the time of trial, an administrator in the LACDA's office for about 13 years. Her husband, Vasquez's stepfather, had been employed for about the same period as a deputy district attorney. After the Attorney General refused the LACDA's request that he assume prosecutorial duties, the LACDA assigned Deputy District Attorney Patricia Wilkinson to prosecute the case. Wilkinson declared she did not know Vasquez's mother or stepfather, though according to defense counsel the mother recalled once having discussed shoe shopping with Wilkinson.

Defendants, through counsel, indicated to Prosecutor Wilkinson their willingness to waive a jury trial and have the charges adjudicated by the assigned trial judge, the Honorable Norman Shapiro. Wilkinson, according to Vasquez's attorney, declined even to raise the possibility with her superiors, giving a reason that prompted Vasquez's attorney to make an oral recusal motion under section 1424, which counsel for Fregoso joined. According to defense counsel, Wilkinson said she "didn't want to do anything that could make it look like there had been any kind of favor toward Mr. Vasquez because of his father being . . . in the district attorney's office." This, defense counsel suggested, constituted evidence that Vasquez was "being treated differently because of who his father is." While the prosecutor had no obligation to waive a jury trial, counsel argued, Wilkinson's response indicated the LACDA's concern that it might

---

[1] All unspecified statutory references are to the Penal Code.

appear to be showing favoritism toward Vasquez had created an "extra layer" of analysis in the office's decisionmaking about Vasquez, one that would not be present if a different office prosecuted the case.

In response, Prosecutor Wilkinson gave three reasons she decided not to waive a jury: she "felt a jury just wouldn't have any difficulty with the evidence"; Judge Shapiro was himself a former member of the LACDA's office and Wilkinson "did not wish to put [the trial] court in a position of having its integrity questioned" in the event of a prodefense ruling; and, the victim's family having been upset because of changes in LACDA staffing on the case and having conveyed concerns "that perhaps we were not pursuing things," Wilkinson "wanted to insure that there was no appearance of any impropriety on the part of our office in handling this."

The trial court denied the recusal motion on the ground the prosecutor had given "an adequate reason" for declining to waive a jury trial, to wit, that "based on the court's long experience as a prosecutor and with this particular office," it would be unwise to try this case to the court.

The case was then tried to a jury, which was unable to reach a verdict. According to defense counsel's discussion with the jurors after the trial court declared a mistrial, two jurors had voted for a verdict of first degree murder, six for second degree murder, three for voluntary manslaughter, and one for acquittal.

The matter was assigned to the Honorable Larry Fidler for retrial. Defendants renewed their recusal motion, this time in written form relying on section 1424 and defendants' due process rights under the United States and California Constitutions. The motion again relied on the prosecutor's fear of apparent favoritism as a reason for declining to try the case to Judge Shapiro, as well as on three additional factual circumstances. First, after the mistrial, the prosecutor had refused to accept pleas to voluntary manslaughter, continuing instead to demand pleas to at least second degree murder, and "is still charging ahead with her assassination [first degree murder] theory." Second, at the first trial, "the case became a *cause celebre* with numerous deputy district attorneys hanging around the courtroom." Counsel amplified the latter point at the motion hearing, stating that "this case has a lot of intensity because of the fact of who Mr. Vasquez's father is, and . . . the atmosphere was electric, it was very intense and it was very uncomfortable." Finally, the defense planned to call Vasquez's stepfather as a witness at the retrial; he would testify Vasquez habitually carried a pocketknife.

Prosecutor Wilkinson responded that it was Judge Shapiro's prior relationship with the LACDA's office and the undesirability of putting him in a

position "of having his decision perhaps questioned" that had led her to decline a court trial before him, though she also referred separately to "avoid[ing] the appearance of impropriety," without specifying whether her reference was to an appearance on the part of Judge Shapiro or the LACDA. With regard to the plea offer, Wilkinson stated she believed the facts of the case supported first degree murder on a theory of premeditation or lying in wait and did not show provocation so as to support a voluntary manslaughter verdict. She was willing, as her office had always been, to accept pleas of second degree murder.

The trial court denied the renewed motion to recuse, reasoning that the stepfather's potential role as a witness was not grounds for disqualifying the entire LACDA office and Wilkinson's refusal to waive a jury before Judge Shapiro was based on the identity of the trial judge, not the family relationship between Vasquez and LACDA employees. For these reasons, the court found, defendants had not met their burden under section 1424 of showing a likelihood of unfair treatment.

The case was tried to dual juries, which convicted defendants of second degree murder. The Court of Appeal affirmed, holding the recusal motion should have been granted but defendants, on appeal, had failed to show prejudice from the error. The appellate court found Vasquez's family relationship with LACDA employees had caused a conflict of interest for that office, a conflict sufficiently severe as to indicate a likelihood defendants would not receive fair treatment at all stages of the criminal proceedings. (§ 1424; *People v. Eubanks* (1996) 14 Cal.4th 580, 593–594 [59 Cal.Rptr.2d 200, 927 P.2d 310].) Both the existence of a conflict and its severity were evidenced by the prosecutor's admission that concerns over appearing to favor Vasquez had motivated, at least in part, her decision not to waive a jury trial, and by the prosecutor's refusal after the first jury hung to offer a plea less than second degree murder. The record showed pressure from the victim's family "created the potential for unfairness in this case where the prosecutor felt an obligation to treat Vasquez more harshly in order to avoid a charge of favoritism."

In light of its view of the conflict, the Court of Appeal observed, it would have granted defendants relief from the erroneous recusal denial had they sought relief before trial by filing a petition for a writ of mandate based solely on the *likelihood* of unfair treatment. But on appeal, the court held, defendants were entitled to reversal only if they could show the error caused "actual harm" in the form of a *"probability* (versus possibility)" of a different result had a nonconflicted attorney prosecuted the case. Defendants could not do so: Because the jury hung in the first trial, no prejudice resulted from the prosecutor's refusal to try the case to Judge Shapiro, and the prosecutor's

offer of a plea to second degree murder was fair, if not as favorable as an offer of voluntary manslaughter; further, whether a nonconflicted prosecutor would have made defendants a manslaughter offer is "necessarily speculative." The Court of Appeal did not discuss whether the trial court's failure to recuse the LACDA required reversal on the ground it deprived defendants of due process.

We granted defendants' petitions for review.

## DISCUSSION

I. *The Trial Court Erred Under Section 1424 in Denying the Recusal Motion*

We agree with the Court of Appeal that the close family relationship between longtime employees of the LACDA and defendant Vasquez created a conflict of interest and a consequential likelihood of unfair treatment that should have been avoided through recusal of the prosecutorial office. The assigned deputy district attorney admitted, both to defense counsel and at the first recusal motion hearing, that concerns about an appearance to the victim's family of favoritism by the LACDA's office had in part influenced her to reject the defense proposal for a bench trial before Judge Shapiro. This admission of an extrinsic influence over the prosecutor's discretionary decisionmaking showed both the conflict's existence—i.e., that because of the family relationship there was a "reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner"—and that its severity required the LACDA be disqualified—i.e., that the conflict was "so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings." (*People v. Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5]; see *People v. Eubanks, supra*, 14 Cal.4th at p. 594 (*Eubanks*).)

As we explained at length in *Eubanks*, public prosecutors in California are required to exercise their discretionary functions, which are broad in scope and subject to only limited review, " 'with the highest degree of integrity and impartiality.' " (*Eubanks, supra*, 14 Cal.4th at p. 589, quoting *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 267 [137 Cal.Rptr. 476, 561 P.2d 1164].) Impartiality, in this context, means not that the prosecutor is indifferent to the conviction or acquittal of the defendant—the prosecutor does not share in the neutrality expected of the judge and jury—but that the prosecutor is "expected to exercise his or her discretionary functions in the interests of the People at large, and not under the influence or control of an interested individual." (*Eubanks*, at p. 590.) The public prosecutor's proper interest " ' "is not that it shall win a case, but that justice shall be done." ' " (*Id.* at p. 589.)

In section 1424, the Legislature established a substantive test for a motion to disqualify the district attorney: "The motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." The statute demands a showing of a real, not merely apparent, potential for unfair treatment, and further requires that that potential "rise to the level of a *likelihood* of unfairness." (*Eubanks, supra,* 14 Cal.4th at p. 592.) Although the statute refers to a "fair trial," we have recognized that many of the prosecutor's critical discretionary choices are made before or after trial and have hence interpreted section 1424 as requiring recusal on a showing of a conflict of interest " 'so grave as to render it unlikely that defendant will receive fair treatment *during all portions of the criminal proceedings.*' " (*Eubanks,* at p. 593, quoting *People v. Conner, supra,* 34 Cal.3d at p. 148.)

On review of the trial court's denial of a recusal motion, "[o]ur role is to determine whether there is substantial evidence to support the [trial court's factual] findings [citation], and, based on those findings, whether the trial court abused its discretion in denying the motion." (*People v. Breaux* (1991) 1 Cal.4th 281, 293–294 [3 Cal.Rptr.2d 81, 821 P.2d 585]; accord, *Eubanks, supra,* 14 Cal.4th at p. 594.) Here, the trial court found Deputy District Attorney Wilkinson had declined the defense offer of a bench trial before Judge Shapiro because of "the problems attendant with his [Judge Shapiro's] past position," rather than "because of who the defendant is, vis-à-vis his stepfather and his mother." This finding is not supported by substantial evidence.

At the first recusal motion hearing, Vasquez's attorney represented to the court that Wilkinson had told him she was not interested in waiving a jury because "she didn't want to do anything that could make it look like there had been any kind of favor toward Mr. Vasquez because of his father being . . . in the District Attorney's office." Wilkinson did not contradict this aspect of defense counsel's account of their conversation. In describing her motives, she said she was concerned about possible criticism of Judge Shapiro should he rule for the defense, but continued, "And, also, I wanted to insure that there was no appearance of impropriety on the part of our office in handling this."

At the second hearing, defense counsel repeated his representation that Wilkinson had told him "she decided not to do that [waive a jury] because she said it might have the appearance of an impropriety that they're giving Mr. Vasquez some kind of a break . . . ." Again, Wilkinson did not deny she had made such a statement, stating only that she had put on the record before Judge Shapiro "that in light of the judge's prior relationship with the office I felt that it will be best not to waive jury to him to avoid the appearance of

impropriety and also I did not wish to put him in that position of making a decision and ultimately having his decision perhaps questioned."

Before the trial court was thus defense counsel's uncontradicted representation that Deputy District Attorney Wilkinson had told counsel she was reluctant to waive a jury before Judge Shapiro because it could be seen as favoritism by the LACDA toward Vasquez motivated by his close family relationship with LACDA employees. While Wilkinson also cited concerns about possible criticism of Judge Shapiro, she confirmed that with the victim's family expressing the view "that perhaps we were not pursuing things," she "wanted to insure that there was no appearance of any impropriety on the part of our office in handling this." On this record, the trial court's apparent finding that Wilkinson was motivated *only* by the desire to prevent possible criticism of Judge Shapiro, and not also by an appearance of favoritism toward Vasquez by the LACDA, was unsupported by substantial evidence.

Examining the trial court's decision to deny recusal in this factual light, we conclude the court abused its discretion. In most circumstances, the fact one or two employees of a large district attorney's office[2] have a personal interest in a case would not warrant disqualifying the entire office. (See *Millsap v. Superior Court* (1999) 70 Cal.App.4th 196, 200–204 [82 Cal.Rptr.2d 733]; *Trujillo v. Superior Court* (1983) 148 Cal.App.3d 368, 370–373 [196 Cal.Rptr. 4].) But where the record on the recusal motion indicates that the conduct of any deputy district attorney assigned to the case, or of the office as a whole, would likely be influenced by the personal interest of the district attorney or an employee, the motion is properly granted. (See *People v. Conner, supra*, 34 Cal.3d at pp. 148–149 [recusal of entire office proper where deputy district attorney witnessed the defendant's violent courthouse escape and assault on a deputy sheriff, a "harrowing experience" he discussed with coworkers]; *People v. Choi* (2000) 80 Cal.App.4th 476, 480–483 [94 Cal.Rptr.2d 922] [same where district attorney with indirect personal connection to charged murder continued to involve himself in the proceedings despite "ethical wall" established within his office].)

In the present case, Deputy District Attorney Wilkinson had no personal interest in the case, but two other employees of the LACDA, Vasquez's mother and stepfather, did. That personal interest, by raising the concern that acceding to a defense request would be perceived by the victim's family as favoritism to Vasquez, influenced Wilkinson's decision not to accept a

---

[2] According to the LACDA Web site, the office has a staff "of approximately 1,962 includ[ing] 948 deputy district attorneys, 239 investigators, and 775 support personnel, comprising the largest local prosecutorial agency in the nation." (<http://da.co.la.ca.us/> [as of July 10, 2006].)

defense proposal for a bench trial. The admitted role Vasquez's family relationship with LACDA employees played in influencing the prosecutor's conduct of the case demonstrated a likelihood defendants would not be treated fairly by the LACDA at all stages of the criminal proceedings, requiring the office's recusal. (*Eubanks, supra*, 14 Cal.4th at pp. 593–594.)[3]

Although defendant Fregoso did not have a family relationship to LACDA employees, we assume, without deciding, that the influence of Vasquez's family relationship on the prosecutor's decision not to waive a jury trial provided codefendant Fregoso with an equivalent justification to seek recusal of the LACDA. The Attorney General does not assert that on this record any basis exists to distinguish between defendants in this regard.

## II. *Defendants Fail to Show a Due Process Violation*

Defendants contend the failure to disqualify the LACDA's office was a violation not only of section 1424 but also of their federal and state due process rights (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, §§ 7, 15) and that such a constitutional violation is a structural error admitting of no harmless error analysis. We conclude the error was not of constitutional dimension and therefore do not reach the question of prejudice from a constitutional violation.

Defendants argue, first, that section 1424 merely provides a procedural framework for adjudicating the constitutional question, not a separate substantive standard for deciding whether a prosecutor's continued participation is impermissible. We disagree. As we have previously explained (see *Eubanks, supra*, 14 Cal.4th at p. 591; *People v. Conner, supra*, 34 Cal.3d at p. 147), section 1424 was enacted in part to refine the standard for pretrial

---

[3] Other circumstances the defense relied on in the trial court as evidence of a disabling conflict are less compelling. That the defense intended to call Vasquez's stepfather, a deputy district attorney with the LACDA's office, as a witness did not itself require the office's disqualification. (See *People v. Snow* (2003) 30 Cal.4th 43, 86–87 [132 Cal.Rptr.2d 271, 65 P.3d 749].) That several deputy district attorneys attended the trial at times, making the atmosphere "intense" and "uncomfortable," does not demonstrate a likelihood of unfair treatment.

Finally, unlike the Court of Appeal, we are not persuaded the prosecutor's unwillingness to accept a plea to voluntary manslaughter, after the jury deadlocked in the first trial, shows a disabling conflict. From brief postmistrial discussion, Deputy District Attorney Wilkinson stated, she understood the jury had deadlocked nine to three in favor of first degree murder. Even according to defense counsel's count, eight of the 12 deadlocked jurors had voted for murder. The prosecutor had witnesses who could provide both a preexisting motive (retaliation for Ayala's recent assault on a young woman associated with Vasquez and Fregoso's tagging crew) and evidence of preparation for a serious assault or killing (Vasquez's approaching the victim with a knife in hand). Under these circumstances, we are not convinced the prosecutor's decision to continue demanding pleas of at least second degree murder reflects any unusual or improper consideration.

recusal this court had articulated in *People v. Superior Court (Greer), supra,* 19 Cal.3d 255 *(Greer).* In *Greer,* we held the trial court had the *statutory* authority under Code of Civil Procedure section 128 to disqualify the prosecuting attorney. *(Greer,* at p. 261, fn. 4.) The recusal standard we stated was any conflict of interest that might "affect or *appear* to affect" the prosecutor's impartiality. *(Id.* at p. 269, italics added.) Responding to an increase in the number of recusals, which the Attorney General attributed in part to *Greer*'s "appearance" standard, the Legislature made clear in Penal Code section 1424 that a conflict of interest, whether actual or apparent, required recusal under our statutory law only if it bore an *actual likelihood* of leading to unfair treatment. *(Eubanks,* at pp. 591–592.) In addition to providing for procedures by which the motion for recusal was to be made and answered, section 1424 established *substantive* requirements for a motion to disqualify the district attorney. *(Eubanks,* at p. 591.)

We disagree, as well, with the suggestion that under the actual likelihood standard every erroneous denial of a recusal motion under section 1424 is also a deprivation of due process. In *Greer,* while considering the scope of the trial court's authority against the "background" of "the due process implications of prosecutorial bias" *(Greer, supra,* 19 Cal.3d at p. 268), we expressly rejected the notion that "before he recuses a prosecutor, the trial judge must first determine that failure to do so would permit a violation of the defendant's basic constitutional rights" *(id.* at p. 264). Rather, the goal of pretrial recusal is to avoid conflicts that *might* lead ultimately to due process violations and hence to reversals or mistrials. The constitutional guarantees of a fair trial, we explained in *Greer,* "would seem better served when judges have discretion to prevent even the possibility of their violation. Individual instances of unfairness, although they may not separately achieve constitutional dimension, might well cumulate and render the entire proceeding constitutionally invalid. The trial judge need not delay until the last straw of prejudice is added, by which time it might be too late to avert a mistrial or a reversal." *(Id.* at pp. 264–265.)

Even under the somewhat narrower standard the Legislature created in section 1424, pretrial recusal still fulfills the prophylactic function we identified in *Greer.* Though no longer including circumstances where a conflict only *appears* to affect the prosecutor's impartiality, trial courts' statutory power under section 1424 continues to allow recusal whenever a conflict creates a *likelihood* of unfair treatment. This standard serves to prevent potential constitutional violations from occurring. Thus, the failure to recuse when required under section 1424 may lead to the denial of a fair trial or other unfair treatment, but does not necessarily do so.

Neither this court nor the United States Supreme Court has delineated the limitations due process places on prosecutorial conflicts of interest.[4] In *Greer*, as noted, we treated the due process problem of an interested prosecutor as "background." (*Greer, supra*, 19 Cal.3d at p. 268.) We observed that a "fair and impartial trial" is fundamental to due process and that the prosecutor, as well as the court, must "respect this mandate" by exercising his or her discretionary powers impartially (*id.* at p. 266), but we did not define the types or severity of interestedness that would violate the constitutional mandate. Similarly, in *Marshall v. Jerrico, Inc.* (1980) 446 U.S. 238, 249–250 [64 L.Ed.2d 182, 100 S.Ct. 1610], the federal high court observed that "[p]rosecutors are also public officials; they too must serve the public interest" and that consequently "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." In the case before it, however, the court found it unnecessary to say "with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias [an institutional financial interest in increased enforcement] is exceptionally remote." (*Id.* at p. 250, fn. omitted.)

The Supreme Court gave the problem of an interested prosecutor further attention in *Young v. U. S. ex rel. Vuitton et Fils S. A.* (1987) 481 U.S. 787, 790 [95 L.Ed.2d 740, 107 S.Ct. 2124] (*Vuitton*), holding improper a district court's appointment, to prosecute a criminal contempt for violations of an injunction against trademark infringement, of attorneys who also represented the trademark holder. Special criminal contempt prosecutors, like United States Attorneys, should have an undivided duty to see justice done. (*Id.* at pp. 803–804.) The interest of the government in "dispassionate assessment of the propriety of criminal charges for affronts to the Judiciary" is not necessarily congruent with the private client's interest in the monetary benefits of enforcing the court's injunction. (*Id.* at p. 805.) Because of the attorneys' ethical duties to their private client, moreover, the conflict was unusually manifest: while ordinarily "we can only speculate whether other interests are likely to influence an enforcement officer," where a prosecutor also represents an interested private party, "the ethics of the legal profession *require* that an interest other than the Government's be taken into account." (*Id.* at p. 807.)

Defendants' reliance on *Vuitton* for the proposition that participation of an interested prosecutor universally or generally infringes due process suffers

---

[4] We have repeatedly refrained from assuming that section 1424's substantive standard is identical to, or different from, constitutional commands. (*People v. Snow, supra*, 30 Cal.4th at p. 86, fn. 12; *Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 833, fn. 4 [118 Cal.Rptr.2d 725, 44 P.3d 102]; *Eubanks, supra*, 14 Cal.4th at p. 596, fn. 8.)

from a fatal flaw: *Vuitton* was decided not on constitutional grounds but under the United States Supreme Court's supervisory powers over the lower federal courts. (*Vuitton, supra*, 481 U.S. at pp. 790, 809.) Only Justice Blackmun, in a concurring opinion, wrote that "the practice—federal or state—of appointing an interested party's counsel to prosecute for criminal contempt is a violation of due process." (*Id.* at pp. 814–815 (conc. opn. of Blackmun, J.).) *Vuitton* stands as an example of how external influences might affect discretionary prosecutorial decisionmaking, but does not establish a due process test for prosecutorial conflicts.

Several lower federal courts and courts of our sister states have squarely addressed prosecutorial conflicts as a due process problem. The most influential decision has been *Ganger v. Peyton* (4th Cir. 1967) 379 F.2d 709 (*Ganger*), which like *Vuitton* involved a prosecutor's simultaneous representation of a private party with an interest in the criminal case. The *Ganger* court found Ganger's Virginia assault conviction constitutionally invalid because the prosecuting attorney had simultaneously "represented Ganger's wife in the prosecution of a divorce action . . . based upon the same alleged assault on Mrs. Ganger. Ganger testified that the prosecuting attorney offered to drop the assault charge if Ganger would make a favorable property settlement in the divorce action." (*Id.* at p. 711.) The prosecutor's self-interest ("including the possibility that the size of his fee would be determined by what could be exacted from defendant") thus made it impossible for him to exercise "fair-minded judgment" with regard to whether and how to prosecute Ganger criminally. (*Id.* at p. 713.) "We think the conduct of this prosecuting attorney in attempting at once to serve two masters, the people of the Commonwealth and the wife of Ganger, violates the requirement of fundamental fairness assured by the Due Process Clause of the Fourteenth Amendment." (*Id.* at p. 714.)

A number of courts have followed *Ganger* in holding a prosecutor's simultaneous representation of an interested private party infringes the defendant's right to a fundamentally fair trial. In *Cantrell v. Commonwealth* (1985) 229 Va. 387 [329 S.E.2d 22], for example, the murder victim's parents hired a private attorney to assist the public prosecutor in trying the victim's husband for her killing. Although the public prosecutor was present throughout the trial, the private attorney took the lead, examining most of the witnesses and making the closing argument. The same private attorney represented the parents in a civil proceeding in which they sought custody of the defendant and the victim's child. (*Id.* at pp. 24–25.) The appellate court held the likelihood of conflict between the attorney's two interests "rises to the level of an overwhelming probability," substituting "private vengeance [for] impartial application of the criminal law" in violation of the defendant's due process rights. (*Id.* at p. 26.)

More recently, the court in *State v. Eldridge* (Tenn.Crim.App. 1997) 951 S.W.2d 775, 782, also found a due process violation in the participation of "special prosecutors who represent the victim in a civil matter arising from the same incident giving rise to the criminal prosecution." The potential for influence on the prosecution by a private interest is simply too great in situations involving such simultaneous representation: "Just as a special prosecutor may be tempted to bring a tenuously supported prosecution if such a reward promises financial or legal rewards for the private client, a special prosecutor may also be tempted to suggest the abandonment of a meritorious prosecution if a settlement providing benefits to the private client is conditioned on a recommendation against criminal charges." (*Id.* at p. 781.)[5]

In contrast to these cases involving simultaneous representation of directly conflicting interests, a number of courts have declined to find a due process violation where the prosecutor is alleged merely to have a personal interest that might add to his or her zeal. Thus, in *Wright v. United States* (2d Cir. 1984) 732 F.2d 1048 (*Wright*), the defendant asserted the assigned Assistant United States Attorney (Puccio) had a disabling conflict of interest because his wife (whom he met and married while investigating the defendant) was a political opponent of the defendant, had urged authorities to investigate him, and had allegedly been assaulted, on another occasion, by the defendant's associates. (*Id.* at p. 1055.)

The *Wright* court found an appearance of impropriety, but no due process violation, in assignment of the case to Puccio. (*Wright, supra*, 732 F.2d at pp. 1055, 1057–1058.) The court distinguished *Ganger* both as to the role of the interested prosecutor and the nature of his interest. First, the investigation and prosecution were initiated not by Puccio but by the United States Attorney. "Second, even if we interpret the facts most adversely to Wright's prosecutors, they were not utilizing the criminal process to advance their own pecuniary interests, such as the prosecutor's interest in *Ganger* 'that the size of his fee would be determined by what could be exacted from defendant' in the divorce case, [*Ganger, supra*, 379 F.2d] at [p.] 713. . . . Mrs. Puccio's interest, unlike Mrs. Ganger's, was not a pecuniary interest in utilizing the criminal process to further her position in civil litigation but a public one in

---

[5] See also *State v. Cox* (1964) 246 La. 748 [167 So.2d 352, 358] (failure to recuse district attorney who was the victim in a closely related charged crime deprived the defendant of a "fair and impartial trial"); *People v. Zimmer* (1980) 51 N.Y.2d 390, 395 [414 N.E.2d 705, 708, 434 N.Y.S.2d 206] (where the public prosecutor who procured indictment against a corporation's founder and principal owner was also corporate counsel, prosecutor was "serving . . . two masters[,] . . . a problem instinct with due process implications"). Cases of *successive* representation, in which an attorney who has represented the defendant joins the prosecutor's office and appears against the defendant in the same matter, have also been held to violate fundamental fairness. (See, e.g., *Young v. State* (Fl.Dist.Ct.App. 1965) 177 So.2d 345, 347; *Davenport v. State* (1981) 157 Ga.App. 704 [278 S.E.2d 440, 441].)

the condemnation of a man whom she thought, whether for good reasons or for bad, to have violated the public trust. [Citation.] In short, this case, with the facts taken at their worst against the Government, does not present the spectacle of a prosecutor's using the 'awful instruments of the criminal law' [citation] for purpose of private gain and, although we consider the choice of Puccio as prosecutor to have been ill advised, we do not regard it as having deprived Wright of due process of law." (*Wright*, at pp. 1057–1058.)[6]

That personal influences on a prosecutor are not always regarded as creating so substantial a conflict as to deprive the defendant of fundamental fairness is not surprising. District attorneys, as people, inevitably hold individual personal values and allegiances and feel varying emotions relating to their work. As public officeholders, they may also have political ambitions or apprehensions. But that a public prosecutor might feel unusually strongly about a particular prosecution or, inversely, might hesitate to commit to a prosecution for personal or political reasons does not inevitably indicate an actual conflict of interest, much less a constitutional bar to prosecution. (See *Schumer v. Holtzman* (1983) 60 N.Y.2d 46, 56 [454 N.E.2d 522, 467 N.Y.S.2d 182] [district attorney's "anxiety" over an appearance of impropriety, arising from her past political differences with the defendant, not grounds for disqualification]; *People v. Nelson* (N.Y.Crim.Ct. 1995) 167 Misc.2d 665, 672–674 [647 N.Y.S.2d 438, 443] [neither district attorney's actions in urging federal prosecution after earlier state acquittal in high profile case, nor effect of prior acquittal on his possible political ambitions, shows existence of a conflict that would disqualify district attorney from prosecuting the defendant on new, unrelated charges].)

Even as regards *judicial* disqualification, the United States Supreme Court has distinguished between "matters of kinship [and] personal bias," which "seem generally to be matters merely of legislative discretion," and a judge's "direct, personal, substantial, pecuniary interest in reaching a conclusion against" a defendant, which deprives the defendant of due process. (*Tumey v. Ohio* (1927) 273 U.S. 510, 523 [71 L.Ed. 749, 47 S.Ct. 437]; accord, *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1025 [119 Cal.Rptr.2d 341, 45 P.3d 280].) In *Aetna Life Ins. Co. v. Lavoie* (1986) 475 U.S. 813, 820 [89 L.Ed.2d 823, 106 S.Ct. 1580], for example, the federal

---

[6] See also *United States v. Heldt* (1981) 215 U.S. App. D.C. 206 [668 F.2d 1238, 1276–1278] (fact that the defendants had sued prosecutors in a civil action arising out of searches did not demonstrate due process violation requiring reversal on appeal where the defendants had not sought recusal on this basis in the trial court and no evidence indicated conflict had influenced course of criminal action); *Villalpando v. Reagan* (Ct.App. 2005) 211 Ariz. 305 [121 P.3d 172, 176–178] (where conflicted city prosecutor had recused.himself and recommended neighboring city's prosecutor be appointed to prosecute, speculation that nomination was based on some influence conflicted prosecutor had over substitute prosecutor held insufficient to show due process violation).

high court held a state supreme court justice's "general hostility towards insurance companies that were dilatory in paying claims," arising out of the justice's personal experience, did not, as a constitutional matter, preclude the justice from sitting in a case involving bad faith failure to pay claims. Such general frustration did not reveal a disqualifying bias, as "it is likely that many claimants have developed hostile feelings from the frustration in awaiting settlement of insurance claims." (*Id.* at p. 821.) In contrast, the justice's simultaneous participation as a plaintiff in a different bad faith suit gave him a " ' "direct, personal, substantial, [and] pecuniary" ' " stake in the outcome of the case before the state supreme court (*id.* at p. 824), violating the insurer litigant's due process rights (*id.* at p. 825).

The Supreme Court's postulate that pecuniary conflicts of interest on a judge's or prosecutor's part pose a constitutionally more significant threat to a fair trial than do personal conflicts of interest may be somewhat counterintuitive, for common experience tells us that personal influences are often the strongest. But according "matters of kinship [and] personal bias" (*Tumey v. Ohio, supra,* 273 U.S. at p. 523) dispositive constitutional importance in this context would import into constitutional law a set of difficult line-drawing problems. As neither judges nor prosecutors can completely avoid personal influences on their decisions, to constitutionalize the myriad distinctions and judgments involved in identifying those personal connections that require a judge's or prosecutor's recusal might be unwise, if not impossible. The high court's approach to judicial conflicts generally leaves that line-drawing process to state disqualification and disciplinary law, with only "the most extreme of cases" being recognized as constitutional violations. (*Aetna Life Ins. Co. v. Lavoie, supra,* 475 U.S. at p. 821.)

To show a due process violation arising from a prosecutor's conflicting interest should be more difficult than from a judge's, for the "rigid requirements" of adjudicative neutrality (*Marshall v. Jerrico, Inc., supra,* 446 U.S. at p. 248), articulated in *Tumey v. Ohio, supra,* 273 U.S. 510, and other cases, do not apply to prosecutors. "[T]he strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime." (*Marshall v. Jerrico, Inc.,* at p. 250.)

In this light, we are not persuaded that in the case at bench the prosecutor's desire to avoid an appearance of favoritism presented by an indirect personal link between the prosecutor and defendant Vasquez deprived these defendants of fundamental fairness in the proceedings. Neither Deputy District Attorney Wilkinson nor her supervisors had a direct, substantial interest in the outcome or conduct of the case separate from their proper interest in seeing justice

done. They did have an interest in avoiding an appearance of favoritism by the LACDA, but we do not believe this conflict was "so severe as to deprive [defendants] of fundamental fairness in a manner 'shocking to the universal sense of justice.' " (*Villalpando v. Reagan, supra,* 121 P.3d at p. 175.)

Given that "matters of kinship" do not necessarily create a constitutional bar even to a *judge's* participation (*Tumey v. Ohio, supra,* 273 U.S. at p. 523), we are unable to conclude the family relationship between a defendant and two employees out of hundreds in a public prosecutor's office (see fn. 2, *ante*) *constitutionally* bars that entire office from participating in the prosecution. The indirect family link here, and the potential it created that the LACDA would "bend over backwards" to make sure no favoritism appeared, are closer to the district attorney's "anxiety" over an appearance of impropriety in *Schumer v. Holtzman, supra,* 454 N.E.2d at page 527, or the advocacy interest of the prosecutor's wife in *Wright, supra,* 732 F.2d at pages 1057–1058, than to the prosecutors' simultaneous representation of directly conflicting interests in *Ganger, supra,* 379 F.2d at pages 713–714, *State v. Eldridge, supra,* 951 S.W.2d at page 781, or *Cantrell v. Commonwealth, supra,* 329 S.E.2d at page 26.

Nor can defendants point to any specific prosecutorial actions taken as a result of the conflict that deprived them of a fundamentally fair proceeding. Although Wilkinson's fear of seeming to favor Vasquez influenced her decision to decline a bench trial before Judge Shapiro, the result of that decision was only that defendants received a jury trial—which, in any event, led to a mistrial rather than convictions. As discussed above (see fn. 3, *ante*), the evidence does not support a finding that Vasquez's family relationship to LACDA employees influenced Wilkinson or her office in their decision not to accept pleas to voluntary manslaughter rather than murder.

As to the prosecutor's conduct at the second trial, Vasquez points to two pieces of evidence he contends the prosecutor improperly introduced and one instance in which the prosecutor did not timely inform defense counsel of potential inculpatory evidence. Vasquez does not argue these incidents constituted unconstitutional misconduct in themselves, but rather that they demonstrate the prosecutor's extraordinary zeal and lack of impartiality. Evidentiary issues and discovery disputes of this type are fairly common in serious criminal trials, however, and absent more we cannot conclude they either showed or resulted from a fundamentally unfair conflict of prosecutorial interest. Zealous advocacy in pursuit of convictions forms an essential part of the prosecutor's proper duties and does not show the prosecutor's participation was improper. (*Hambarian v. Superior Court, supra,* 27 Cal.4th at p. 843.)

Because the failure to recuse the LACDA did not infringe upon defendants' state or federal constitutional rights to due process of law, the Court of Appeal did not, as defendants contend, err in failing to consider the error to be a structural violation of fundamental constitutional rights or to apply the harmless error standard for constitutional trial error.

### III. *Violation of Section 1424 Is Not Structural Error*

To the extent defendants contend a failure to recuse that violates section 1424 but *not* due process principles is a structural error and hence reversible per se, we disagree. Prejudice from such a state law error, as we explain below, must instead be evaluated under the standard of *People v. Watson, supra*, 46 Cal.2d 818 (*Watson*). Under that standard, the trial court's error here was harmless.

■ Article VI, section 13 of the California Constitution provides that no judgment shall be set aside because of an error in procedure unless the reviewing court, "after an examination of the entire cause, including the evidence," concludes the error "has resulted in a miscarriage of justice." We have construed this provision to require in most circumstances an appellate determination whether, in light of the entire record, " 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Cahill* (1993) 5 Cal.4th 478, 492 [20 Cal.Rptr.2d 582, 853 P.2d 1037], quoting *Watson, supra*, 46 Cal.2d at p. 836.) At the same time, we have recognized that certain fundamental errors in procedure, sometimes referred to as " 'structural,' " "are not susceptible to the 'ordinary' or 'generally applicable' harmless-error analysis—i.e., the *Watson* 'reasonably probable' standard—and may require reversal of the judgment notwithstanding the strength of the evidence contained in the record in a particular case." (*Cahill*, at p. 493.)

Whether the erroneous denial of a motion to disqualify the prosecutor under section 1424 is structural in character and, if not, how actual prejudice may be shown on appeal are questions of first impression in this court. Nor has the United States Supreme Court decided whether participation of an interested prosecutor is prejudicial per se. But in *Vuitton, supra*, 481 U.S. 787, a four-justice plurality of the high court asserted that the appointment of an interested private party's attorney to prosecute a criminal contempt (which the court majority held improper under its nonconstitutional supervisory authority) was an error " 'so fundamental and pervasive' " as to require reversal without any prejudice analysis. (*Id.* at p. 809.)[7]

---

[7] Three justices agreed with the *Vuitton* plurality that the appointment was an error, but disagreed it was prejudicial per se and would have remanded for a determination of prejudice (*Vuitton, supra*, 481 U.S. at pp. 825–827 (conc. & dis. opn. of Powell, J.)), while one justice

The *Vuitton* plurality gave several reasons for this conclusion, reasons that have also been articulated in several sister-state decisions. The plurality first looked to the prosecutor's critical role in criminal proceedings, comparing the participation of a conflicted prosecutor to that of a conflicted judge, a discriminatorily selected grand jury, or a petit jury exposed to biasing publicity, all of which it regarded as fundamental error regardless of actual prejudice. (*Vuitton, supra,* 481 U.S. at p. 810.)[8] Second, the plurality focused on the appearance of impropriety created by an interested prosecutor, reasoning that "[a] concern for actual prejudice in such circumstances misses the point, for what is at stake is the public perception of the integrity of our criminal justice system." (*Vuitton,* at p. 811.)[9] Finally, the plurality averred that "[a]ppointment of an interested prosecutor is also an error whose effects are pervasive. Such an appointment calls into question, and therefore requires scrutiny of, the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision. Determining the effect of this appointment thus would be extremely difficult. A prosecution contains a myriad of occasions for the exercise of discretion, each of which goes to *shape* the record in a case, but few of which are *part* of the record." (*Vuitton,* at pp. 812–813.)[10]

A number of state and federal courts, on the other hand, have refused to grant the defendants reversals and new trials because of the participation of a conflicted prosecutor without a showing of actual prejudice, even when agreeing the prosecutor should have been recused. In *Wright, supra,* 732 F.2d

---

dissented entirely (*id.* at p. 827 (dis. opn. of White, J.)). The fifth vote for reversal came from Justice Scalia, who would have held the district court had no constitutional authority to initiate a contempt prosecution or appoint *any* prosecutor. (*Id.* at p. 815 (conc. opn. of Scalia, J.).)

[8] Accord, *Sinclair v. State* (Ct.App. 1976) 278 Md. 243 [363 A.2d 468, 475], and footnote 8 (prejudice "presumed" as a matter of public policy in light of prosecutor's role in deciding whether to bring charges); *Com. v. Tabor* (1978) 376 Mass. 811 [384 N.E.2d 190, 196] ("The district attorney is vital to the administration of justice and to the vindication of constitutional rights. In view of his great responsibilities, a district attorney may not compromise his impartiality. [Citations.] We therefore require a new trial"); *State v. Basham* (1969) 84 S.D. 250 [170 N.W.2d 238, 242] (as public prosecutors are "quasi-judicial officers representing the state," public policy requires reversal without a showing of "specific prejudicial acts").

[9] Accord, *Davenport v. State, supra,* 278 S.E.2d at page 441 (appearance of impropriety denies the defendant a fair trial); *People v. Zimmer, supra,* 414 N.E.2d at page 708 ("Moreover, even if the actuality or potentiality of prejudice were absent, what of the appearance of things . . . ?"); *State v. Eldridge, supra,* 951 S.W.2d at page 784 ("What is at stake is the public perception of the integrity of our criminal justice system").

[10] Accord, *People v. Stevens* (Colo.Ct.App. 1981) 642 P.2d 39, 41 (no prejudice showing required because evidence prosecutor revealed confidences received while previously representing the defendant "would be well-nigh impossible for a defendant to bring forth"); *Com. v. Tabor, supra,* 384 N.E.2d at page 196, footnote 13 (" 'almost impossible to establish actual prejudice' "); *People v. Zimmer, supra,* 414 N.E.2d at page 707 (referring to "practical impossibility of establishing that the conflict has worked to defendant's disadvantage"); *State v. Eldridge, supra,* 951 S.W.2d at page 784 (conflict of interest violations "defy analysis by the harmless error standards").

at pages 1056–1057, the court focused on the procedural posture of the case before it—a collateral postconviction attack rather than a pretrial motion to recuse or even a direct appeal. "Indeed, we think that the degree of prosecutorial misconduct of the sort here in question and *the degree of prejudice to the defendant necessary to justify action by a reviewing court* steadily increase as the case goes forward, with the least being required on a motion to disqualify, somewhat more on a pretrial motion to dismiss an indictment, still more on a motion in the district court after conviction but before appeal, somewhat more on direct appeal, and as will be developed below, a good deal more on collateral attack." (*Id.* at p. 1056, fn. 8, italics added.)

Similarly, in *United States v. Heldt, supra,* 668 F.2d at pages 1276–1277, the court distinguished between a timely motion to disqualify, which should be granted if the prosecutor has a conflicting interest, and an appeal following a trial at which the defendant did not make a recusal motion. In that situation, the appellate court held, "the government interest[] in conserving judicial and prosecutorial resources" mandated the defendants must be required to "prove actual prejudice" to obtain a reversal. (*Id.* at p. 1277.) The court added that a conflicted prosecutor presented a "less fundamental . . . threat to defendants" than participation by a conflicted defense attorney or judge, situations in which no showing of actual prejudice is required. (*Id.* at p. 1277, fn. 83.)[11]

 In the circumstances of this case, we hold, as did the appellate court below, that the trial court's violation of section 1424 does not entitle defendants to reversal on appeal without a showing of prejudice. Relief from an erroneous denial under section 1424 is available by pretrial writ petition. (See, e.g., *Millsap v. Superior Court, supra,* 70 Cal.App.4th at p. 205; *Lewis v. Superior Court* (1997) 53 Cal.App.4th 1277, 1286–1287 [62 Cal.Rptr.2d 331].) At least where, as here, the defendant did not seek such a writ, "the government interest[] in conserving judicial and prosecutorial resources" (*United States v. Heldt, supra,* 668 F.2d at p. 1277), given constitutional force by the "miscarriage of justice" standard that governs our review (Cal. Const., art. VI, § 13), strongly militates against reversing on appeal without a showing of actual prejudice. As the Attorney General points out, we have reached similar conclusions as to somewhat analogous types of error: while in a pretrial motion or review thereof a prospective likelihood of unfairness

[11] Accord, *United States v. Lorenzo* (9th Cir. 1993) 995 F.2d 1448, 1453 (following *Heldt* in requiring a prejudice showing on appeal, even where the defendants apparently did move to recuse in the trial court); *State v. Williams* (Iowa 1974) 217 N.W.2d 573, 575 (while prosecutor may have had a conflict of interest, denial of mistrial upheld because "it does not follow [the conflict] affected the outcome of the trial"); *Commonwealth v. Dunlap* (1975) 233 Pa.Super. 38 [335 A.2d 364, 366] ("While we feel that it was improper for the prosecuting attorney to permit the appearance of a conflict of interest, we fail to find any specific prejudice to the appellant to warrant the grant of a new trial").

suffices, on appeal or collateral attack the defendant must show, at least, a probability that such prejudice actually occurred. (See *People v. Williams* (1989) 48 Cal.3d 1112, 1125–1126 [259 Cal.Rptr. 473, 774 P.2d 146] [change of venue motion]; *People v. Wilson* (1963) 60 Cal.2d 139, 150–154 [32 Cal.Rptr. 44, 383 P.2d 452] [motion to dismiss for denial of speedy trial].)

■ Nor do we find the *Vuitton* plurality's arguments for structural error (*Vuitton, supra,* 481 U.S. at pp. 809–813) compelling as applied to California procedures. While the prosecutor has important obligations to the cause of justice that can be impaired by a conflict of interest, he or she is also an advocate for the defendant's conviction; the basic guardians of the defendant's rights at trial are his attorneys and the court, not the prosecutor. Thus, the participation of a conflicted prosecutor, while it may be error under section 1424, is not as fundamental a flaw in the fairness of the proceedings as the participation of a biased or conflicted judge or juror or a conflicted defense attorney. (*United States v. Heldt, supra,* 668 F.2d at p. 1277, fn. 83.)[12]

An appearance of impropriety arising from participation of a conflicted prosecutor, the second factor relied upon in *Vuitton, supra,* 481 U.S. at page 811, is less of a consideration under section 1424 than under the high court's supervisory authority. As we have previously noted, section 1424 was enacted in part to tighten the standards for recusal so that a mere appearance of impropriety would not itself suffice; the statutory standard focuses instead on the actual likelihood of unfair treatment. (*Eubanks, supra,* 14 Cal.4th at pp. 591–592.) To hold that an erroneous failure to recuse under section 1424 is reversible per se because of the appearance of impropriety it creates would be contrary to the statutory policy.

The strongest argument for considering the participation of a conflicted prosecutor to be structural error is the third one relied upon in *Vuitton, supra,* 481 U.S. at pages 812–813, and echoed by a number of other cases (see fn. 10, *ante*): that the potential effects of the error pervade the proceedings, possibly including any of the discretionary decisions the prosecutor makes

---

[12] Trial by a judge who lacks impartiality is given as an example of structural error in *Arizona v. Fulminante* (1999) 499 U.S. 279, 309 [113 L.Ed.2d 302, 111 S.Ct. 1246] (citing *Tumey v. Ohio, supra,* 273 U.S. 510 [judicial conflict of interest]). The denial of an impartial jury is also reversible per se. (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1087–1088 [259 Cal.Rptr. 630, 774 P.2d 659].) Representation by defense counsel with a conflict of interest is described as structural in *People v. Cahill, supra,* 5 Cal.4th at page 493 (citing *People v. Mroczko* (1983) 35 Cal.3d 86 [197 Cal.Rptr. 52, 672 P.2d 835]). (See also *Cuyler v. Sullivan* (1980) 446 U.S. 335, 348–350 [64 L.Ed.2d 333, 100 S.Ct. 1708] [a defendant who did not object at trial to joint representation with codefendant need not show prejudice, but must show that actual conflict of interest adversely affected counsel's performance]; *People v. Ortiz* (1990) 51 Cal.3d 975, 988 [275 Cal.Rptr. 191, 800 P.2d 547] ["Reversal is automatic, however, when a defendant has been deprived of his right to defend with counsel of his choice"].)

from charging to sentence recommendation, and themselves could affect the composition of the record, making it practically impossible to trace the error's prejudicial effects. This is obviously true in a certain respect: the reasons for a prosecutor's discretionary decisions rarely appear in the record, and one often cannot know what different decisions a nonconflicted prosecutor would have made.

Yet sometimes defendants are able to show actual prejudice, or at least a strong probability of actual unfair treatment, as, for example, in *Ganger*, where there was evidence the prosecutor "offered to drop the assault charge if Ganger would make a favorable property settlement in the divorce action" (*Ganger, supra*, 379 F.2d at p. 711), or *State v. Eldridge, supra*, 951 S.W.2d at page 783, in which it was apparent that payment of a certain amount in settlement of the civil case "would result in a favorable recommendation of the special prosecutors in the criminal matter." Even in the case at bench it is claimed, and the Court of Appeal agreed, that the conflict of interest influenced Deputy District Attorney Wilkinson's decision, after the first jury deadlocked, not to reduce her plea bargain demand from second degree murder to voluntary manslaughter. Although we conclude the record does not support such a finding (see fn. 3, *ante*), this form of prejudice *could* be demonstrated on other facts. The possible prejudicial effects of a conflict of interest on the part of the prosecutor may be pervasive, but they are not necessarily untraceable.

The question, ultimately, is whether the threat to the integrity of criminal proceedings posed by participation of a prosecutor with a conflict of interest that before trial "render[ed] it unlikely that the defendant would receive a fair trial" (§ 1424), but which in the event did not demonstrably affect the actual course of the proceedings, justifies a departure from the ordinary rule, grounded in the need for finality of judgments and conservation of judicial resources and embodied in article VI, section 13 of the California Constitution, that to obtain reversal a criminal appellant must show prejudice. At least under the circumstances of this case—where defendants failed to avail themselves of their pretrial remedy by filing a writ petition—we conclude no such departure is justified.

 Finally, for reasons related to those discussed in part II., *ante*, we conclude the trial court's error in this case was harmless under *Watson*. The prosecutor's refusal to stipulate to a bench trial before Judge Shapiro, while it was influenced by the prosecutor's conflict of interest, was not detrimental to defendants as the result was only that they received a jury trial, which did not end in conviction. The record does not show a likelihood that Judge Shapiro would instead have acquitted defendants of murder had he been the trier of fact. Nor does the record show any other prejudicial prosecutorial choices or

conduct traceable to the LACDA's conflict of interest. Thus it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* 46 Cal.2d at p. 836.)

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

Kennard, J., Baxter, J., Chin, J., and Corrigan, J., concurred.

**CORRIGAN, J.,** Concurring.—I concur in the judgment, but write separately to emphasize the unique circumstance that gave rise to this conflict for the Los Angeles County District Attorney's Office (LACDA). Because defendant Andrew Vasquez's parents were LACDA employees, Prosecutor Patricia Wilkinson expressed concern that decedent's family might interpret her waiver of a jury trial as an act of favoritism to Vasquez. During the hearing on Vasquez's recusal motion, Wilkinson told the court that the decedent's family was "very concerned that perhaps we were not pursuing things." She stated, "I wanted to insure that there was no appearance of any impropriety on the part of our office in handling this."

It is to be expected that families of homicide victims will be acutely concerned about the progress of a defendant's prosecution. An act of homicide claims a life, but it also profoundly affects the family that is left behind. The desire by these family members for a diligent and vigorous prosecution is understandable. Crime victims have a right to actively follow the case that results from a defendant's conduct. That they may do so, and may do so with intensity, does not create a conflict, nor should our opinion be read to imply that it does so.

However, a prosecutor speaks not solely for the victim or his family, but for all the People. The body of the "The People" includes the defendant and his family and citizens who know nothing about a particular case. The district attorney is expected to exercise his or her discretionary functions independently in the interests of the entire community.

The line crossed here was a very fine one. It flowed from the particular relationship of Vasquez and his family with the prosecutor's office itself. Wilkinson's laudable goal of avoiding the appearance of impropriety created its own irony. Wilkinson sought to make clear that Vasquez was not receiving more lenient treatment because of his parents' employment. In the process, she appears to have treated him differently because of that relationship. Defendants may legitimately be treated differently for a wide variety of

reasons. But this particular disparity of treatment, based on Vasquez's familial ties to the prosecutor's office, is what gave rise to the conflict here.

I concur with the majority that the trial court's failure to disqualify the LACDA's office was a violation only of Penal Code section 1424 and not defendants' federal and state due process rights. The prosecutor's refusal to stipulate to a bench trial was harmless. (*People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

**MORENO, J.,** Concurring and dissenting.—I concur in the majority's conclusion that "the close family relationship between longtime employees of the LACDA [Los Angeles County District Attorney's Office] and defendant [Andrew] Vasquez created a conflict of interest and a consequential likelihood of unfair treatment that should have been avoided through recusal of the prosecutorial office." (Maj. opn., *ante,* at p. 55.) I also agree with the majority that not every violation of Penal Code section 1424 (section 1424) necessarily violates due process guarantees. (Maj. opn., *ante,* at p. 59.) I dissent, however, from the majority's further conclusion that the denial of defendants' recusal motions in this case did not constitute a due process violation. (*Id.* at p. 58.)

The pattern of conduct by the prosecutor in this case established that Vasquez was treated differently and less favorably than another defendant in his position would have been who did not have Vasquez's family connection to the LACDA. This disparate treatment of Vasquez violated the duty imposed on prosecutorial offices to exercise their discretion in an impartial and evenhanded manner "born of objective and impartial consideration of each individual case." (*People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 267 [137 Cal.Rptr. 476, 561 P.2d 1164].) As we stated in *Greer,* "[i]ndividual instances of unfairness, although they may not separately achieve constitutional dimension, might well cumulate and render the entire proceeding constitutionally invalid." (*Id.* at p. 265.) That point was reached by the time of the second motion to recuse because by then there was demonstrable evidence that the prosecutor's discretionary decisions were being driven by the LACDA's concern that it not be perceived as showing any favoritism to Vasquez due to his family connection to the office. Because "we do not know and cannot now ascertain what would have happened if the prosecuting attorney had been free to exercise the fair discretion which he owed to all persons charged with crime in his court" (*Ganger v. Peyton* (4th Cir. 1967) 379 F.2d 709, 714), I am unable to conclude that the constitutional violation was harmless beyond a reasonable doubt. (*Ibid.,* citing *Chapman v.*

*California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) Accordingly, I would reverse defendants' convictions.[1]

I emphasize at the outset that my conclusion arises from the specific facts of this case viewed in their totality. I do not intend to suggest that a prosecutor's office should be recused in every case in which either a defendant or a victim of crime has some family connection to that office. Moreover, even in this case, recusal would not have been necessary had there not been a pattern of unfair treatment of Vasquez both on the record and reasonably inferable from the record. My opinion should be read with those caveats in mind.

I begin with the applicable law. Classically, the concept of due process does not describe discrete events in a prosecution but describes the entire unfolding procedure. (*People v. Lyons* (1956) 47 Cal.2d 311, 319 [303 P.2d 329] ["It is axiomatic that when an accused is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process"].) The seminal case regarding prosecutorial conflicts makes it clear that prosecution of a defendant by a conflicted prosecutor implicates the due process right to a trial that is "fair and impartial" at every stage of the proceeding. (*People v. Superior Court (Greer)*, *supra*, 19 Cal.3d at p. 266.) As *Greer* also makes clear, "It is the obligation of the prosecutor, as well as of the court, to respect this [due process] mandate." (*Ibid.*)

The prosecutor has a special duty of impartiality that flows from his or her function as " 'the representative . . . of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.' " (*People v. Superior Court (Greer)*, *supra*, 19 Cal.3d at p. 266.) Moreover, the prosecutor's role as representative of the People necessarily includes " 'the defendant and his family and those who care about him. It also includes the vast majority of citizens who know nothing about a particular case, but who give over to the prosecutor the authority to seek a *just* result in their name.' (Corrigan, *On Prosecutorial Ethics* (1986) 13 Hastings Const.L.Q. 537, 538–539.)" (*People v. Eubanks* (1996) 14 Cal.4th 580, 589–590 [59 Cal.Rptr.2d 200, 927 P.2d 310], italics added.)

The obligation of a prosecutor to observe the mandate of due process is particularly crucial in light of the prosecutor's broad discretionary powers

---

[1] Although the basis of the conflict in this case involved the employment of Vasquez's parents by the LACDA, as codefendant Anthony Fregoso observes he and Vasquez were tried together—before the second trial Fregoso moved unsuccessfully to sever his trial from Vasquez's—and thus Fregoso's "fate was dependent upon the prosecutor's treatment of [Vasquez] with regard to every discretionary decision."

during the course of a criminal prosecution. "[I]t is precisely because the prosecutor enjoys such broad discretion that the public he serves and those he accuses may justifiably demand that he perform his functions with the highest degree of integrity and impartiality . . . ." (*People v. Superior Court (Greer)*, *supra*, 19 Cal.3d at pp. 266–267; see *People v. Eubanks, supra,* 14 Cal.4th at p. 590 ["Thus the district attorney is expected to exercise his or her discretionary functions in the interests of the People at large, and not under the influence or control of an interested individual"].) To fulfill this due process obligation, the prosecutor's exercise of discretion must be "born of objective and impartial consideration of each individual case." (*People v. Superior Court (Greer)*, *supra*, 19 Cal.3d at p. 267.)[2]

Applying these principles to the instant case, the record shows that certain discretionary decisions made by the prosecutor were not "born of objective and impartial consideration" of the circumstances of this case but affected by LACDA's interest in avoiding allegations by the victim's family or the general public that favoritism had been shown to the child of longtime employees of the office. Furthermore, I submit that this conflict was not personal to the prosecutor who handled defendant's case but was an institutional conflict involving the entire LACDA. The clearest evidence that this conflict was institutional, and that it was recognized as such by the LACDA itself, can be inferred from the fact that the Los Angeles District Attorney tendered the prosecution to the Attorney General long before defendants' motions to recuse the office.[3] Given that the head of the office recognized the existence of a potentially disabling conflict, it is not plausible that the various discretionary decisions made by the individual prosecutor in this case did not reflect an institutional interest in avoiding any showing of favoritism toward Vasquez.

With respect to those discretionary decisions, I find compelling evidence of the disparate and unfair treatment of Vasquez in the prosecutor's refusal to

---

[2] I do not believe that what the majority describes as the "somewhat narrower standard the Legislature created in section 1424" (maj. opn., *ante*, at p. 59), diminishes the prosecutor's responsibilities in this respect. To the contrary, the two-part test established by section 1424 for recusal seems to echo these due process concerns. Under the statute, "a 'conflict,' within the meaning of section 1424, exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office *may not exercise its discretionary function in an evenhanded manner*" and recusal is required when the conflict is "so grave as to render it unlikely that defendant will receive fair treatment during *all* portions of the criminal proceedings." (*People v. Conner* (1983) 34 Cal.3d 141, 148 [193 Cal.Rptr. 148, 666 P.2d 5], italics added.)

[3] As I emphasized at the outset, in examining whether the conflict in this case violated defendants' due process rights, I am focused only on the particular constellation of facts presented here. I do not intend to suggest that every case in which a district attorney unsuccessfully tenders prosecution of a case to the Attorney General will necessarily constitute evidence of the existence of a disabling conflict. The subsequent conduct by the district attorney's office may demonstrate that any conflict was successfully negotiated.

waive jury trial. The majority and I are in agreement that, based on the prosecutor's own statements, this decision was influenced by the prosecutor's concern "about an appearance to the victim's family of favoritism by the LACDA's office" toward the child of longtime employees. (Maj. opn., *ante*, at p. 55.)

In light of this admission, I also find suspect the prosecutor's decision to refuse defendants' offer to plead guilty to voluntary manslaughter. The majority argues that the prosecutor's refusal was justified by the vote of the first jury that showed at least eight jurors had voted either for first or second degree murder—three voted for voluntary manslaughter and one to acquit— and because the evidence was susceptible to an assessment that Vasquez committed murder. (Maj. opn., *ante*, at p. 58, fn. 3.) I disagree.

The prosecutor's earlier refusal to accept a court trial in order to avoid the appearance of favoritism leads to the conclusion that a similarly improper motive likely led her to reject defendants' offers to plead to voluntary manslaughter. Under the circumstances, a prosecutor who was not hindered by a conflict of interest would have seriously considered, and likely accepted, defendants' offer. The first trial had left fully one-third of the jury unconvinced that a murder had occurred. A prosecutor looking at this result, knowing that his or her evidence was likely to be weakened by the passage of time and the availability of a transcript with which to impeach prosecution witnesses, might well have accepted a plea to a lesser charge.

Finally, as the Court of Appeal observed, the evidence in this case could also have supported a finding that Vasquez did not intend to kill the victim. "Vasquez had no prior criminal record. The evidence of Vasquez's intent was arguably ambiguous. The evidence showed the P.A.L. and C.N.E. tagging crews were rivals but that their usual mode of confrontations was fistfights. The tagging crews had no history of using deadly weapons, or any weapons for that matter, beyond mace or pepper spray. The jury at the first trial obviously could not agree on the crime committed. It is possible that several of these jurors believed Vasquez and Fregoso merely intended to assault and scare the victim rather than kill him."

In light of these circumstances, I cannot agree with the majority that the prosecutor's categorical rejection of defendants' offer to plead to voluntary manslaughter was not influenced by the conflict that the prosecutor admitted had influenced her decision not to waive jury. In my view, that conflict appears to have permeated the prosecutor's treatment of defendant.

In short, "[g]iven the entire complex of facts in this case," I conclude that defendants did not "receive fair and impartial treatment" (*Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 852 [118 Cal.Rptr.2d 725, 44 P.3d 102] (dis. opn. of Moreno, J.)), resulting in a violation of their due process rights. (Cf. *People v. Eubanks, supra*, 14 Cal.4th at p. 599 ["the trial court must consider the entire complex of facts . . . to determine whether the conflict makes fair and impartial treatment of the defendant unlikely"].) A prosecutor, straining to avoid showing any favoritism toward the child of career employees of her office, made at least two documented discretionary decisions that were not reached in a fair and impartial manner. These decisions must be viewed in light of the recognition by the Los Angeles District Attorney that this case represented a potentially disabling conflict as evidenced by his unsuccessful tender of the case to the Attorney General. Thus, the individual prosecutor's discretion in this case was guided by institutional concerns about showing favoritism to Vasquez rather than concerns personal to her. Accordingly, I would reverse defendants' convictions.

George, C. J., concurred.

Appellants' petition for a rehearing was denied August 16, 2006. Moreno, J., was of the opinion that the petition should be granted.