49 Cal.Rptr.3d 590 (2006)
143 Cal.App.4th 846
Massey HARAGUCHI, Petitioner,
v.
The SUPERIOR COURT of Santa Barbara County, Respondent;
The People, Real Party in Interest.
No. B191161.
Court of Appeal of California, Second District, Division Six.
October 5, 2006.
*591 Sanger & Swysen, for Petitioner.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Steven D. Matthjews, Supervising Deputy Attorney General, David F. Glassman, Deputy Attorney General, for Respondent.
Thomas W. Sneddon, Jr., District Attorney, County of Santa Barbara and Gerald McC. Franklin, Senior Deputy District Attorney, for Real Party in Interest.
YEGAN, J.
Massey Harushi Haraguchi petitions for a writ of mandate directing the respondent trial court to grant his motion to recuse Deputy District Attorney Joyce Dudley (Dudley) and the Office of the District Attorney of Santa Barbara County. According to petitioner, "Dudley has a conflict of interest based on the fact that she is prosecuting petitioner in a rape by intoxication case at the same time she is promoting a self-published novel about a rape by intoxication case which includes details from petitioner's case." We will grant the petition as to Dudley with the hope that this case of first impression will make a case of lasting impression.[1]

*592 Factual and Procedural Background

On September 14, 2005, an information was filed charging petitioner, inter alia, with rape of an intoxicated person. (Pen. Code, § 261, subd. (a)(3).)[2]
On April 25, 2006, petitioner filed his recusal motion. The motion was based on Dudley's self-published novel, Intoxicating Agent, and her promotion of the novel, which was published in January 2006 by Infinity Publishing. According to Infinity Publishing's website, it charges "a one-time setup fee of only $499. For this, your book will be . . . shipped to you as a real, hardcopy book in about 8 weeks from submission. It will be made available for sale on our ecommerce Web site, submitted to amazon.com and others, and sold to bookstores on a returnable basis. . . . We will then pay you royalties each month on all sales of your book."

The Novel
The novel concerns the exploits of Santa Barbara County Deputy District Attorney Jordon Danner. According to an article dated March 31, 2006, and published on the website of the Santa Barbara Independent, a local newspaper, "Dudley admits [Danner] is a pumped-up version of herself." In an article published on Dudley's website, she is quoted as stating that Danner is "`Joyce [Dudley] on steroids.'" The novel describes Danner as "zealous . . . about seeking justice" and "brave" in "stepping up and fighting for it." Danner has "the poise and sexiness of a dancer, the brains of a scholar, and the protective passion of a mother."
The book jacket summarizes the novel as follows: "While prosecuting a volatile arson/murder case, . . . Jordon Danner finds herself in the untenable position of falling under the influence of her adoring and seductive investigating Officer. Jordon's attraction to him collides with her love and devotion for her husband, family, and justice. In an effort to resolve her heart-wrenching conflict, as well to consider the hurdles she now faces in the murder case and an impending trial of an alleged rapist, Jordon retreats to her remote mountain home. This story occurs in an astonishing 48 hours during which time Jordon confronts a diverse assemblage of life-altering, intoxicating agents."
In the novel the victim of the rape is Diana Johnson. Diana is described as "devoted to her job, community, family, and friends." "Her afternoons and evenings were filled with ongoing community outreach programs, one of which was devised by her. The project she created involved children and the elderly working together in a vegetable garden." At the time of the rape, Diana was intoxicated from alcohol. "[L]ab reports revealed that the only intoxicating agent present in her system was alcohol, which was found at, `extremely high levels.'" Danner concludes that Diana is an alcoholic "in denial about her alcoholism."
The defendant in the novel is 42-year-old Ernesto Cantera, described as having a "bloated" face, a "protruding belly," and "filthy hands." "Talk about felony ugly, [Danner] thought, he looks just like the pig he is!" "Felony ugly," the author notes, is "[a]n in-house expression used by some prosecutors to describe a defendant who fits the stereotype of a perpetrator of the crime for which he is charged." Danner was "saddened . . . especially because Cantera turned out to be so despicable." "`This dirt bag really did a number on her [Diana].'" Danner said to herself, "`I'll get you, you heartless bastard . . . for Diana's sake and for all the others who could *593 follow.' [¶] But if I try . . . and don't succeed, then all he'll learn is that he can get away with victimizing woman [sic]. I can't try this one . . . unless I can win it."
Cantera had sexual intercourse with Diana on the beach. Cantera told the police that Diana had consented to having sex. Diana had no memory of the events. "She dreaded telling the jury about how much she'd had to drink and that she remembered nothing." Danner believed that "Diana couldn't remember any part of the rape because she was experiencing an alcoholic black out [sic]." Danner further believed that, because of the blackout, Diana "was incapable of giving legal consent to having sex with the defendant."
Arty Lang is Cantera's friend. He works as a bartender and is an avid photographer. Lang is described as "a skinny-dark-haired-beatnik" and "[a] skinny man with stringy, black hair." Lang took photographs of Cantera having sex with Diana on the beach. He tried to blackmail Diana by threatening to publish the photographs on the internet if she cooperated with the prosecution. Law enforcement officials arrested Lang while he was showing the photographs to Diana. The officials apparently convinced Lang "that the best thing he can do is come clean and testify for the prosecution."
Cantera's counsel, Ted Ross, had a "reputation for being both disingenuous and manipulative." He told Danner that his client would plead guilty to a reduced charge of sexual battery provided that she agreed "to probation and no additional jail time." On April 6, 2006, Ross appeared in court and inquired about his offer. A deputy district attorney standing in for Danner said that Ross's offer was rejected and that Danner was going to kick his "ass." The deputy district attorney later explained to Danner, "[I]t's true, you will kick his ass. Because in a month's time your victim will walk into that courtroom with her head held high. Beyond that, it sounds like young [Lang is] going to give you all the corroborating testimony and photos you could hope for."

Recusal Motion
In his recusal motion, petitioner alleged: "[Dudley's] book contains a lengthy fictional account of a rape by intoxicating agent. Just like [petitioner's] trial, [the] Deputy D.A. arranged for the fictional trial to begin in April 2006. These and other coincidences lead [petitioner] to fear that the lines between fact an[d] fiction have been obscured by the publication of the book, and that the District Attorney's obligation to exercise discretion and seek justice impartially is now compromised by her financial and emotional interests in promoting her book."
In support of the recusal motion, petitioner's counsel declared that, in her novel, Dudley had "incorporated facts of the real District Attorney's investigation of [petitioner's] case. . . ." "Arty Lang shares many attributes of [petitioner]. Arty Lang is a photographer. [Citation.] [Petitioner] is a photographer. Arty is described as a `skinny-dark-haired-beatnik.' [Citation.] Petitioner, who weighs 140 pounds and is 5' 7", is thin. He has black hair. He has facial hair in a style called a `soul patch,' a style associated with beatniks."
Petitioner's counsel declared that Dudley "has been promoting the book throughout the county of Santa Barbara." The book is being sold in at least two local bookstores. Dudley conducted a book signing at one of the book stores and at the Women's Center of the University of California at Santa Barbara. On April 4, 2006, a local television station, KEYT, interviewed Dudley about the book. The Santa Barbara Independent published a *594 favorable review of the novel, "giving readers five reasons to read the book."
According to petitioner's counsel, "[w]hen [he] took over [petitioner's] case from prior counsel, Ms. Dudley's first unsolicited remarks to me were . . . that no other prosecutor at the DA's office would take a case like [petitioner's], but that she could win it." Counsel indicated that Dudley's remarks were similar to the following excerpt from the novel: "Jordon [Danner] was positive another D.A. wouldn't want this case, and, she knew the victim would feel betrayed if she handed it off."
Petitioner's counsel further declared, "From the first time [he] talked to Ms. Dudley about this case, she said it would not settle. She refused to enter into any settlement negotiations and has summarily informed the court that the case will go to trial."
In opposition to the recusal motion, Dudley declared: "This fictional book is not directly or indirectly based on the facts of the instant case. The fictional book does not describe any events or details of the case against [petitioner]. The fact that I have written and published this fictional book has not affected or impacted any of my decisions in this case." "At no time has my writing of this fictional book or its publication and release date in any way influenced my discretionary decision-making, nor did it in any way affect the course of the investigation or prosecution. At no time have I, or anyone else to my knowledge, coordinated or scheduled any trial and pretrial date in the case so as to publicize or promote this fictional book; on the contrary, the current trial date resulted from a request by [petitioner] to continue the trial."
Dudley denied stating to petitioner's counsel "`that no other prosecutor at the DA's office would take a case like [petitioner's], but that [she] could win it.'" She also denied that she had refused to enter into settlement negotiations: "As the court is aware, I participated in a settlement discussion and, during this discussion, defense counsel affirmed that the only acceptable disposition would consist of a misdemeanor offense not requiring the defendant to register as a convicted sex offender."
At the hearing on the recusal motion, the trial court ruled as follows: "[I]t doesn't appear to me as though there is a conflict that would justify recusal of Ms. Dudley. The publication of her book appears to be coincidental to [petitioner's] circumstances. The circumstances related in her book factually don't appear to relate to [petitioner's] circumstances. . . . [¶] If there were any potential conflict, there could not be recusal unless that conflict was so grave as to render it unlikely that the defendant would receive a fair trial, and I don't think there's any evidence of that. It has not been demonstrated or established that any publicity related to Ms. Dudley's book has been so extensive or interlinked with [petitioner's] case that he would be unlikely to receive a fair trial." "It's noted that [petitioner] may have a physical resemblance to a character in the book [Arty Lang], who happens not to have been the perpetrator of the crime in the book, and that certainly, in my view, doesn't implicate any prejudice to [petitioner's] right to a fair trial."[3]

*595 Standards for Recusal under Section 1424

Section 1424, enacted in 1980, "established both procedural and substantive requirements for a motion to disqualify the district attorney. Substantively, the statute provides the following standard: `The motion shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial.'" (People v. Eubanks (1996) 14 Cal.4th 580, 591, 59 Cal.Rptr.2d 200, 927 P.2d 310; see also People v. Vasquez (2006) 39 Cal.4th 47, 45 Cal.Rptr.3d 372, 137 P.3d 199.) "[A] `conflict,' for purposes of section 1424, `exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner. Thus, there is no need to determine whether a conflict is "actual" or only gives an "appearance" of conflict.' [Citation.] But however the conflict is characterized, it warrants recusal only if `so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings.' [Citation.]" (People v. Eubanks, supra, 14 Cal.4th at p. 592, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
"[T]he potential for prejudice to the defendantthe likelihood that the defendant will not receive a fair trialmust be real, not merely apparent, and must rise to the level of a likelihood of unfairness. Thus, section 1424 . . . does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would appear improper, or would tend to reduce public confidence in the impartiality of the criminal justice system. [Citations.]" (Ibid.) Even an "appearance of . . . impropriety" that "would be highly destructive of public trust," standing alone, is not "a ground for recusal of the district attorney" under section 1424. (Id., at p. 593, 59 Cal. Rptr.2d 200, 927 P.2d 310.)
Accordingly, section 1424 should be read "as establishing a two-part test: (i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting? Thus, while a `conflict' exists whenever there is a `reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner,' the conflict is disabling only if it is `so grave as to render it unlikely that defendant will receive fair treatment.' [Citation.]" (People v. Eubanks, supra, 14 Cal.4th at p. 594, 59 Cal.Rptr.2d 200, 927 P.2d 310, fn. omitted.)

Standard of Review and Cases of First Impression
"`Our role is to determine whether there is substantial evidence to support the [trial court's factual] findings . . ., and, based on those findings, whether the trial court abused its discretion in denying the motion. . . .'" (People v. Eubanks, supra, 14 Cal.4th at p. 594, 59 Cal.Rptr.2d 200, 927 P.2d 310.) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." (Shamblin v. Brattain (1988) 44 Cal.3d 474, 478, 243 Cal.Rptr. 902, 749 P.2d 339; see also People v. Vasquez, supra, 39 Cal.4th 47, 45 Cal.Rptr.3d 372, 137 P.3d 199.)
We cannot affirm the trial court's ruling on the deferential standard of appellate *596 review. This is a first impression case and the trial court had no precedent to guide it. The case is "unusual" and the trial court's ruling cannot realistically be viewed as a routine exercise of discretion. (See In re Marriage of Williams (2001) 88 Cal.App.4th, 808, 813, 105 Cal.Rptr.2d 923.) This court has an independent interest in policing conflicts of interest and safeguarding the constitutional rights of the accused. (See Morrow v. Superior Court (1994) 30 Cal.App.4th 1252, 36 Cal. Rptr.2d 210) In the event of conviction, this court will hear the appeal. One of our goals is to timely remove problematic appellate issues, not perpetuate them so that they may be considered on direct review and on collateral attack. We are unable to explain why the Office of the District Attorney of Santa Barbara is, apparently, of a different view. As we shall explain, here, as a matter of law, the trial court was required to recuse Dudley as the trial prosecutor.

Dudley's Further Prosecution of Petitioner Would Be Unseemly
As our Supreme Court has made clear in Eubanks, Dudley cannot be recused merely because her further participation in the prosecution of petitioner would be unseemly. She can be recused only if she suffers from a disabling conflict of interest. Nevertheless, in view of "the sound teaching that `justice must satisfy the appearance of justice,'" before discussing the conflict issue we explain why Dudley's further prosecution of petitioner would be unseemly. (Standefer v. United States (1980) 447 U.S. 10, 25, 100 S.Ct. 1999, 64 L.Ed.2d 689.) Although her novel and petitioner's case have differences in their facts, enough similarities exist to suggest that Dudley is relying on petitioner's case for plot lines.
Dudley is using her official position to obtain personal financial gain. Her connection with the Santa Barbara County District Attorney's Office is a major selling point for the book. The front cover shows a file with the heading, "Santa Barbara County District Attorney File." The back cover states, "Joyce Dudley is a Senior Deputy District Attorney for Santa Barbara County. She specializes in: sexual assault crimes, crimes against children, murder, and hate crimes." In the acknowledgements section, Dudley writes, "Weekdays I am surrounded by caring, smart people in the Santa Barbara County District Attorney's Office and in our courtsfor this I am deeply appreciative." On the first page of the novel, Jordon Danner is identified as a "Santa Barbara County District Attorney." No current public employee should be permitted to exploit his or her official position as a lever to earn extra private income. Albeit in a different context, the United States Supreme Court has said that "injecting a personal interest, financial or otherwise, into the [law] enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." (Marshall v. Jerrico (1980) 446 U.S. 238, 249-250, 100 S.Ct. 1610, 1617, 64 L.Ed.2d 182, 193.)
Dudley presents a biased, black-and-white view of the participants in the criminal justice system. She portrays prosecutors as fearless champions of truth and justice. On the other hand, she characterizes the defendant in the novel as "despicable," "felony ugly," a "pig," a "heartless bastard," and a "dirt bag." Defense counsel is portrayed as "disingenuous and manipulative" and as deserving to have his "ass" kicked. These stereotypical generalizations have no place in a current public prosecutor's thinking processes even if they are uttered in a fictional account. A *597 reader of the novel is bound to consider the source of the comments, and the source here is a public prosecutor presently employed by the Santa Barbara County District Attorney's Office. Perhaps without intending to do so, Dudley is potentially infecting the jury pool with her views on the righteousness of cases prosecuted by that office.
Consideration should also be given to the views of petitioner, as expressed by his counsel. The California Supreme Court has indicated that a public prosecutor is "a guardian of the defendant's constitutional rights." (People v. Trevino (1985) 39 Cal.3d 667, 681, 217 Cal.Rptr. 652, 704 P.2d 719, disapproved on another ground in People v. Johnson (1989) 47 Cal.3d 1194, 1219-1221, 255 Cal.Rptr. 569, 767 P.2d 1047; compare People v. Vasquez, supra, 39 Cal.4th 47, 45 Cal.Rptr.3d 372, 137 P.3d 199.) It is understandable that petitioner would question whether his constitutional rights will be protected by a prosecutor who writes a fictional account about a case similar to his own in which the defendant is depicted as a vile brute.

Dudley Suffers from a Disabling Conflict of Interest
We conclude that a conflict exists because there is a reasonable possibility that Dudley may not exercise her discretionary functions in an evenhanded manner. There is a reasonable possibility that Dudley's desire to see her book succeed is so strong that it will trump her duty as a prosecutor "to see that justice is done and to accord to defendants their constitutional rights. [Citations.]" (Reaves v. Superior Court (1971) 22 Cal.App.3d 587, 596, 99 Cal.Rptr. 156.) The success of Dudley's book would result in both financial and emotional rewards. She has been making an effort to promote book sales, and the best means of promotion would be favorable media publicity.
Dudley will garner no laurels, and this case will not generate favorable media publicity for her book, if she enters into a negotiated settlement with petitioner. If, on the other hand, she tries the case before a jury and obtains a conviction, her victory may be acclaimed in the media. Dudley could expect such acclamation to generate favorable publicity for her book, especially since the defendant in the book is charged with the same crime as petitioner. Thus, Dudley's desire to promote her book could motivate her to try the case even though the matter might be fairly resolved through a negotiated plea to a lesser charge.
There is another reason why a conflict exists. Although Danner is a fictional character, it is reasonable to infer that Dudley is using Danner as a mouthpiece for her own views. Dudley closely identifies herself with Danner. Dudley has stated that Danner "is a pumped-up version of herself" and is "`Joyce [Dudley] on steroids.' " Danner's initialsJ.D.are also Dudley's initials. In Danner's world, defendants charged with sex crimes are villains and their counsel are manipulators, while prosecutors are crusaders for justice and victims are pure, courageous, and unselfish.
In the acknowledgments section of the book, Dudley indicates that she shares Danner's perspective of the criminal justice system. Dudley writes: "I don't believe any one [sic] can write a trustworthy novel without the help and support of friends and colleagues who are willing to read and criticize their work." (Italics added.) The implication is that her novel is trustworthy: that it accurately depicts the workings of the criminal justice system. Furthermore, Dudley portrays herself as an advocate for heroic crime victims: *598 "Several times a week, crime victims walk into my office and describe the worst moment of their life, seeking only justice in return. I am in awe of these victims/survivors and feel privileged to be a part of their healing process. My characters were created to honor their bravery. I hope in writing this novel I can give their pain and courage a voice." Thus, there is a reasonable possibility that Dudley's perspective of the criminal justice system, like Danner's, is so one-sided in favor of the prosecution and victims that she may not exercise her discretionary functions in an evenhanded manner.
Is the conflict disabling? In other words, is the conflict "`so grave as to render it unlikely that [petitioner] will receive fair treatment during all portions of the criminal proceedings[?]' [Citation.]" (People v. Eubanks, supra, 14 Cal.4th at p. 592, 59 Cal.Rptr.2d 200, 927 P.2d 310.) We conclude that, given the unusual facts of this case, the conflict is disabling and that the trial court abused its discretion as a matter of law in finding to the contrary.
In addition to the factors discussed above, we also consider the following statement by Dudley in the novel: "[I]t was well known throughout the legal community that a negative outcome on these kinds of cases had a trickle-down effect, resulting in other potential assailants believing if they preyed upon an intoxicated victim, they could get away with rape." This statement indicates that Dudley would be loath to enter into a negotiated settlement if she believed that she could prove the rape charge. To avoid the deleterious "trickle-down effect," Dudley might insist on a plea to the rape charge, whereas another unconflicted prosecutor might allow a plea to a lesser charge as a fair disposition of the case. Or, as a condition of a plea, Dudley might insist on a harsher sentence than another unconflicted prosecutor.

Conclusion
Our decision does not result in a wholesale recusal of Dudley in criminal cases or sexual assault cases. We conclude only that she has a disabling conflict of interest in the instant case, where petitioner is being prosecuted for raping an intoxicated person while the prosecutor is promoting her novel involving the identical charge.[4]
To the extent that petitioner seeks to recuse Joyce Dudley as the trial prosecutor in this case, the petition for a writ of mandate is granted. The petition is denied to the extent that petitioner seeks to recuse the Santa Barbara County District Attorney's Office. The order to show cause, having served its purpose, is discharged. The stay of proceedings previously issued by this court is vacated.
We concur: GILBERT, P.J., and PERREN, J.
NOTES
[1] We deny the request to recuse the entire office of the Santa Barbara District Attorney. Other than speculation, there is no evidence of the likelihood of unfairness if another prosecutor in the office of the Santa Barbara District Attorney takes over this case. (People v. Hamilton (1988) 46 Cal.3d 123, 139, 249 Cal.Rptr. 320, 756 P.2d 1348["[t]he showing must be especially persuasive when the defendant seeks to recuse an entire prosecutorial office and not simply a particular prosecutor. (Citation.)"].)
[2] All statutory references are to the Penal Code.
[3] The petition for a writ of mandate was not accompanied by a copy of the reporter's transcript of the hearing on the recusal motion. In his return to the order to show cause, the Attorney General argues that the petition should be dismissed because of this omission. The Attorney General observes that the California Rules of Court required petitioner to provide a reporter's transcript of the oral proceedings. (Cal. Rules of Court, rule 56(c)(1)(D).) After we issued the order to show cause, petitioner provided a copy of the required reporter's transcript to this court, the Attorney General, and the District Attorney of Santa Barbara County. We deny the Attorney General's request to dismiss the petition "for failure to provide the Court with an adequate record."
[4] Our opinion should not be construed as an attack on the character of this prosecutor. We view Dudley's conduct as a single lapse of judgment.