[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
 OPINION
This is a companion case to Haraguchi v.Superior Court (2006) 143 Cal.App.4th 846
(Haraguchi). In this death penalty case, Jesse James Hollywood, petitioner, seeks a writ of mandate directing the respondent trial court to grant his motion to recuse the Office of the District Attorney of Santa Barbara County. In the alternative, petitioner seeks a writ of mandate directing the trial court to conduct a full evidentiary hearing on the recusal motion. Petitioner contends that, because of the role of the assigned prosecutor, Ronald J. Zonen (Zonen), in the making of a film about the case, "that prosecutor has demonstrated a bias and conflict of interest warranting recusal." "Based on the lack of evidence that [the District Attorney] was unaware of the prosecutor's disqualifying conduct," petitioner also contends that the entire prosecutorial office should be recused.
 We originally summarily denied the petition. The Supreme Court granted review and directed us to issue an order to show cause. We now conclude that the trial court erred by denying the recusal motion as to Zonen, but correctly denied recusal as to the entire Santa Barbara District Attorney's Office.[1]
 Factual and ProceduralBackground On October 30, 2000, the District Attorney of Santa Barbara County (hereafter District Attorney) filed a two-count indictment against petitioner and four codefendants: Ryan Hoyt, William Skidmore, Jesse Rugge, and Graham Pressley. Count 1 charged them with the murder of Nicholas Markowitz. (Pen. Code, § 187, subd. (a).)[2] It alleged as a special circumstance that the defendants had committed the murder during the commission of a kidnapping in violation of section 207. (§ 190.2, subd. (a)(17)(B).) Count 2 charged the defendants with kidnapping Markowitz for the purpose of ransom or to commit extortion in violation of section 209, subdivision (a).
 In their return to the order to show cause, the People summarize the facts underlying the crimes as follows:
 "In brief, evidence before the grand jury revealed that Petitioner . . . was a drug dealer in the San Fernando Valley area of Los Angeles and Ben Markowitz (`Ben,' the older half-brother of 15-year-old Nicholas `Nick' Markowitz) was one of [petitioner's] distributers [sic] for several years. Ben and [petitioner] had a falling-out over a debt Ben owed [petitioner] from the sale of a quantity of `ecstacy' [sic] supplied by [petitioner], and the enmity between them escalated. *Page 861 
 "On Sunday, August 6, 2000, [petitioner], Jesse Rugge . . . and William Skidmore . . . were driving in a van to the home of Ben Markowitz's parents in the San Fernando Valley, intending to break out the windows of that residence in retaliation for Ben's act of breaking the windows of [petitioner's] residence. On the way they spotted Nick Markowitz standing on a street corner near his home. They stopped and forced the boy into the van. They then proceeded, with Nick in their custody, to the home of a friend to pick him up for a pre-arranged trip to Santa Barbara, to attend the annual `Fiesta' celebration in that city and to `party' there.
 "On the way to Santa Barbara, [petitioner] made threats to Nick Markowitz, such as, `If your brother thinks he's going to kill my family, he has another think coming. Your brother is going to pay me money right now,' and `If you run, I'll break your teeth.'
 "Nick Markowitz was detained in the Santa Barbara home of Richard Hoeflinger, another friend of [petitioner's]. Initially, Nick was bound hand and foot with duct tape and was blindfolded. He later was freed of those restraints but remained with Rugge and Pressley, either out of fear or in the belief he was not in personal danger as long as he did as he was told.
 "On Tuesday, August 8, 2000, Rugge, with Nick in tow, rented a room at a motel in Santa Barbara. In Los Angeles, [petitioner] gave Hoyt a Tec-9 automatic machine pistol and sent him back to Santa Barbara with instructions to kill Nick Markowitz. Hoyt and Pressley first drove up Highway 154 to a trailhead called `Lizard's Mouth' atop the mountains separating Santa Barbara and the Santa Ynez Valley and dug a shallow grave. Late that evening, Rugge, Pressley, Hoyt and Skidmore drove young Markowitz to the trailhead and marched him to the gravesite. He was bound with duct tape and blindfolded. Hoyt hit him over the head with a shovel and then shot him with a nine round burst from the Tec-9. Hoyt and Rugge buried him and the four defendants returned to Santa Barbara."
 On August 12, 2000, Markowitz's body was discovered by law enforcement officials. Within 48 hours after the discovery, petitioner's four codefendants (Hoyt, Skidmore, Rugge, and Pressley) were in custody. Petitioner, on the other hand, became a fugitive. He was arrested in Brazil in March 2005 and deported to the United States.
 Petitioner's codefendants were prosecuted by Zonen. In March 2003, after Zonen had obtained convictions against all four codefendants, he was contacted by Nick Cassavetes. Cassavetes was a film director and screenwriter who wanted to make a film, Alpha Dog (Universal Pictures 2007), based on the Markowitz murder. Cassavetes asked Zonen "if he could provide any *Page 862 assistance or materials to help create a screenplay, including trial transcripts, witness contacts, etc." According to Zonen, he "agreed to turn over materials . . . to Nick Cassavetes and act as a consultant in Mr. Cassavetes' preparation" of Alpha Dog.
 Declarations in the Recusal MovingPapers Zonen stated that "the Court should assume that all relevant material in the case against [petitioner] was turned over to the film makers [sic], including all reports, tapes and photos." Zonen further stated that all of those materials "are already in [petitioner's] possession, or will soon be. . . ." The disclosed materials included both police and probation reports. The police reports contained the names, phone numbers, and addresses of witnesses. Zonen may have unintentionally disclosed "rap sheets" containing criminal offender record information. Zonen declared that he gave boxes of materials to the filmmakers and "would not have turned over rap sheets if [he] had known they were in the boxes."
 Zonen never asked for and was not given any monetary consideration for his assistance. Zonen declared that he decided to cooperate with Cassavetes because he believed Alpha Dog would be "the last opportunity to get the kind of widespread publicity necessary to locate [petitioner] and bring him to justice." Zonen stated: "I asked only that [petitioner's] picture be shown at the conclusion of the film along with a phone number to call with information as to his whereabouts. I asked that the audience be told that [petitioner] remains a fugitive and that there is a reward for his arrest." Zonen also asked "that the film be accurate."
 Zonen declared that he had been informed that the film "would be a realistic recounting of the crime, with real names and accurate facts, to be shown nationally and internationally." He believed that "[t]he national and international forums were important, given that it was likely that [petitioner] had fled the country and was beyond the reach of conventional American television." However, after Zonen had given the case materials to Cassavetes, he was informed that "the names and locations would be changed because of liability concerns and difficulty in obtaining insurance." Petitioner's name in the movie is "Johnny Truelove." At the end of the movie, a caption states that Truelove "was finally arrested in `Paraguay' after five years as a fugitive and is waiting trial in `California.'"
 Cassavetes declared: "The `Alpha Dog' movie could have been made without Mr. Zonen's cooperation, but it would have been made worse. Either I would have had to go around him and do a lot more diligent work or I would have had to make it up. This particular version could not have been *Page 863 made." Zonen took Cassavetes and his assistants to the location where the murder of Markowitz had occurred. Zonen helped Cassavetes contact witnesses. Cassavetes asked Zonen for "his opinions on certain participants in the case." Cassavetes "specifically recall[ed] Mr. Zonen describing . . . Ryan Hoyt's family life and Ryan Hoyt's mother." Zonen "told [Cassavetes] overall he felt that these were a bunch of stoned, dumb guys." Cassavetes "[a]t times . . . used Mr. Zonen's assistance . . . for his opinions of character specifics."
 According to Cassavetes, Zonen "was cooperative" and never "said `no' to any request [he] made." Cassavetes characterized Zonen's "attitude towards [him] and the creation of the movie as enthusiastic."[3] Heather Wahlquist, who assisted in the creation of Alpha Dog, declared that Zonen appeared "to be `star-struck' and eager to assist the film-makers."
 Cassavetes also declared that, during his first meeting with Zonen, Zonen "said he was very interested in finding [petitioner]. He asked whether [Cassavetes] intended to identify [petitioner] at the end of the film and if [Cassavetes] intended to show his photograph. Mr. Zonen never requested that [Cassavetes] do so." Cassavetes "told [Zonen he] was just the writer, that no film was yet made, and that there were no plans whatsoever. [Cassavetes] also informed him that [Cassevetes] was not interested in making a 90?minute version of `America's Most Wanted.'"[4]
 The Motion to Recuse On September 9, 2005, petitioner filed a motion to recuse the entire District Attorney's Office. In support of the motion, petitioner's counsel declared that, on August 23, 2005, he had attended "the first and only public screening to date" of Alpha Dog. Counsel alleged that the film portrays petitioner "in an extremely inflammatory manner, [as] extremely manipulative, vicious, selfish, and without any redeeming character traits whatsoever. The Jesse James Hollywood Character was described by several of the public movie viewers as a `monster.'" At the conclusion of the film, special thanks are given to the Santa Barbara Sheriff's Department and to Ron Zonen.
 Petitioner's counsel also declared that Michael Mehas, a researcher and associate producer for Alpha Dog, had refused to speak with him because of *Page 864 Zonen's interference. According to counsel, Mehas was the "film-maker who had the greatest amount of contact with . . . Zonen." Counsel stated that Mehas had initially provided information about his contacts with Zonen. Mehas "described his access, with permission, to the Santa Barbara District Attorney's Office file room where all the case materials were located. [Mehas] stated he was provided access to computer disks, photographs, audio recordings, video recordings, still photographs, law enforcement evaluations, probation reports, and criminal history reports, among other items of evidence. [Mehas] stated these items of evidence were stored in boxes, which he was permitted to remove without supervision from the Santa Barbara District Attorney's Office[.]" The materials received by Mehas included "a psychological report regarding co-defendant Hoyt." In addition, Zonen gave Mehas "Zonen's trial notebook for the prior trial of the co-defendants charged herein. This notebook includes witness statements, prosecutorial impressions, and Mr. Zonen's handwritten notes."
 Petitioner's counsel declared that Mehas's cooperation with the defense ceased after Zonen telephoned him and "expressed anger that Mr. Mehas had spoken to counsel." Zonen "also expressed concern that he would be criminally prosecuted for his conduct, and that the information Mr. Mehas provided could assist in that prosecution."
 Petitioner contended "that the prosecutor's unprecedented misconduct in acting as a `consultant' to film-makers and providing them with unfettered access to his files and evidence qualifies as conduct warranting disqualification." Petitioner argued that "the prosecution's misconduct can only be described as representing a bias against [petitioner]." "The pre-trial publicity in which the prosecution engaged cannot be credibly characterized as the dissemination of `information necessary to aid in the apprehension' of a fugitive . . .; it serves solely to create an inflammatory and prejudicial depiction of [petitioner] and to aggrandize the prosecution." Petitioner requested that the trial court conduct an evidentiary hearing "regarding the full nature and extent of the prosecution's `consultation' as well as the specific details regarding improper dissemination of `relevant materials.'"
 Hearing on the Motion toRecuse On November 1, 2005, the trial court conducted a hearing on the recusal motion. Petitioner conceded that there was not "any impropriety in reference to finances." The trial court accepted Zonen's explanation for assisting the filmmakers: "There is no declaration from any person, in my view, that undermines, or raises any question about Mr. Zonen's assertion and declaration that his sole interest in providing information to the filmmakers was to promote the interests of law enforcement in apprehending [petitioner]. That *Page 865 interest is obviously a lawful and justifiable interest and creates no legal conflict of interest." The court further stated: "There's a suggestion that . . . Mr. Zonen might have been star struck by his association with the filmmakers, or that he took some psychic pleasure in assisting in the production of a movie. Even assuming that that's true, . . . I don't see that that's a legally cognizable conflict." "Finally, even assuming one were to take the view that there was a conflict, I can conceive of no likelihood that it would prevent the [petitioner] from receiving a fair trial."
 The trial court stated that it had viewed a digital video disc made by the filmmakers. The disc shows the filmmakers conversing among themselves immediately after their first meeting with Zonen. One of the filmmakers stated, "[Zonen] wants you to make this movie and he wants you to make this movie as accurate as you can so he can portray [petitioner] for what he is so that he can catch that bastard." The trial court said that the filmmaker's statement "corroborates what Mr. Zonen has been saying in his declarations, which is not really controverted by anything in the defense's declarations." On the disc the filmmaker also said that Zonen had stated: "I'm retiring in seven years. I've got to get this guy before I go."
 At the end of the disc, a filmmaker (apparently Cassevetes) said that Zonen had stated that "anything that we needed he would give us but we have . . . to come to the Markowitz woman [Susan Markowitz, the victim's mother] first . . . and if anything came out I have to say that the Markowitz woman told me." The trial court asked Zonen to explain the filmmaker's comment. Zonen said, "I don't remember a conversation where we talked about crediting information to Susan Markowitz." However, "if there's information that would have come from both of us I could very well have said, `Credit it to Susan Markowitz.' I prefer not to be quoted. . . . [¶] . . . I would not have told them to quote her something she knew nothing about, that would have been foolish."
 The court decided to conduct an evidentiary hearing, but it limited the scope of that hearing to the issue of whether Zonen had improperly influenced Mehas's decision to stop talking to the defense. The court declared: "Only one movie person has been identified . . . as now being unwilling to talk to the defense, and the timing of that is such that it raises a concern in the Court's mind." "And so it seems to me that a limited evidentiary hearing with Mr. Mehas as a witness is relevant to the question of whether or not there's been some improper coercion which might in turn reflect a bias that would be legally significant."
 Mehas testified at the evidentiary hearing. His testimony was as follows: He was involved in two projects. The first project was to assist Cassavetes in *Page 866 writing the screenplay for Alpha Dog. The second was to write a book on the Markowitz murder. Zonen told Mehas that he planned to write a book as well. Later, however, Zonen said that "he couldn't do a book, that it would be improper with . . . [petitioner's] case still outstanding. . . ."
 Mehas met with Zonen approximately 10 to 12 times over a two-year period. Mehas would come into Zonen's office and "pepper him with questions." "[Mehas] would give him [Mehas's] theories of what happened, [Zonen] would give [Mehas] his theories, [and Mehas would] tell [Zonen] why [he] thought [Zonen's theories were] wrong." Mehas considered Zonen to be a "friend."
 There was an understanding between Zonen and Mehas that Mehas would disclose the case materials only to persons working with him on the film. It was also understood that Mehas "wouldn't talk about any of the stuff [he] got from [Zonen]." He would not "even tell people that [Zonen] had turned those documents over to [him]. . . ."
 After petitioner was apprehended, Mehas had two telephone conversations with Zonen. During the second conversation, Zonen asked if he had given rap sheets to Mehas. Mehas believes he told Zonen that he had rap sheets, but "when [he] went through everything [he] didn't have the rap sheets." Zonen "said that he was concerned that [he] would be criminally prosecuted because of allegedly giving [Mehas] documents that he shouldn't have." Zonen never told Mehas not to cooperate with petitioner's counsel or anyone associated with petitioner. Nor did he tell Mehas "not to reveal to anyone any of [Mehas's] prior conversations with [Zonen]."
 Petitioner's counsel asked Mehas for a declaration "as to what transpired between [him] and Mr. Zonen." Mehas refused to give a declaration for two reasons. First, Mehas was concerned that he would be "breaching a moral and ethical confidentiality that [he] had personally with [Zonen]." Mehas stated: "I never wanted to give [counsel] a declaration and never wanted to testify because of my personal, ethical and moral considerations in dealing with a professional attorney on this matter. . . . I was concerned about the information I was getting, and I told [Zonen] that I was going to keep it under my hat."
 The second reason for Mehas's refusal to give a declaration was that, after his telephone conversations with Zonen, he was concerned that Zonen "was going to be facing criminal prosecution for this matter." Zonen's potential criminal liability was the "foremost factor" in Mehas's decision not to give a declaration. It "nailed [his] mouth shut." Mehas was concerned that "if [he] cooperated further with the defense in reference to a declaration that it might harm Mr. Zonen." He was also "concerned about [himself] . . . at that point." *Page 867 
 Mehas interviewed approximately eight witnesses and made notes and tapes of the interviews. Both before and after the interviews, Mehas discussed the witnesses with Zonen. Mehas told Zonen that he would keep these discussions confidential. Mehas did not disclose to Zonen the information he had obtained during the witness interviews: "I wouldn't tell [Zonen] I had a conversation with a witness and then relay that information to him. I didn't give him that information."
 Mehas refused to turn over to the defense his notes and tapes of witness interviews "[b]ecause that is my work product and is going into my book and that's the only place it's going to come out at." The trial court directed Mehas to turn over to the court his notes and tapes of witness interviews. It assured Mehas that the notes and tapes "will be held by the Court, not disclosed to any third person until we have a hearing on this issue and until you're represented by counsel." The court directed Mehas to preserve, but not to turn over to the court, the materials that Zonen had provided to him.
 At the conclusion of Mehas's testimony, the trial court factually found that there was an understanding between Zonen and Mehas that Mehas was not to disseminate the materials received from Zonen to third persons. It also found that there was an understanding that Mehas was not to "talk about getting the materials from Mr. Zonen." The court determined that this understanding of confidentiality did not rise to the level of a conflict of interest.
 Petitioner argued that Zonen had attempted to dissuade Mehas from cooperating with the defense. The trial court rejected this argument: "[Mehas] could not have been more clear on the witness stand, he testified that he made that decision not to cooperate not because of anything Mr. Zonen said to him, . . . [but because] he felt bad about Mr. Zonen's predicament because they had a relationship going back, I guess a few years, and because of that relationship he decided that he would not put Mr. Zonen in any sort of awkward circumstance. That he felt personally responsible. But that at no time did Mr. Zonen ever tell him not to cooperate with the defense, that was a decision that he made on his own."
 The trial court also rejected petitioner's contention that the evidence established that Zonen had violated the law: "[T]o be fair, we don't know if there are violations of law or not, . . . that's entirely speculative. . . . [I]t's a little bit reckless to be claiming that there are violations of law when there's been no forum in which that determination has been made." Even if Zonen had violated the law in providing information to the filmmakers, the trial court perceived no reason "why the turning over of that information, one, is a conflict, and, two, prevents [petitioner] from having a fair trial." *Page 868 
 The trial court reiterated its prior finding concerning Zonen's purpose in cooperating with the filmmakers: "I don't think there's . . . a factual issue regarding the reasons Mr. Zonen turned over the information. . . . [T]he purpose was to assist in the capture of [petitioner]. No one has suggested otherwise in terms of his motivation. There's no financial interest here."
 In denying the recusal motion, the trial court stated: "I don't believe that there's a conflict of interest. Any conflict of interest is remote and tenuous. I don't see any basis for the conclusion that [petitioner] cannot receive a fair trial in this case with Mr. Zonen as the prosecutor."
 Why We Order Recusal ofZonen There is no need to again set forth the standards for recusal under section 1424, the standard of review, and why we cannot affirm the trial court's ruling on the deferential standard of review. We did so in the companion case ofHaraguchi filed this day. (See Haraguchi,supra, 143 Cal.App.4th at pp. 853-854.) Our views there apply here as well. Here, however, there is one over-arching consideration: The penalty sought.
 This is a death penalty case. As our United States and California Supreme Courts have said, "`[d]eath is different.'" (Ring v. Arizona (2002) 536 U.S. 584, 606
[153 L.Ed.2d 556, 122 S.Ct. 2428]; see Keenan v. SuperiorCourt (1982) 31 Cal.3d 424, 430 [180 Cal.Rptr. 489, 640 P.2d 108].) "[I]n striking a balance between the interests of the state and those of the defendant, it is generally necessary to protect more carefully the rights of a defendant who is charged with a capital crime. (Citations.)" (Id., at p. 431.) We thus give rulings in death penalty cases strict scrutiny. Where a prosecutor seeks the ultimate penalty, the prosecutor should be held to the highest standards of the legal profession. In People v. Superior Court (Greer) (1977)19 Cal.3d 255 [137 Cal.Rptr. 476, 561 P.2d 1164], our Supreme Court observed that a prosecutor is held to the "highest degree of integrity and impartiality" (id. at p. 267), and the prosecutor must be free of "personal or emotional involvement" (id., at p. 267, fn. 8). Here, the conduct of Zonen, however well motivated, cannot reasonably be equated with the "highest degree of integrity and impartiality."
 In this first impression death penalty case we should not give our imprimatur to Zonen's conduct or embolden other prosecutors to assist the media in the public vilification of a defendant in a case which is yet to be tried. Perhaps without intending to do so, Zonen has potentially infected the jury pool with his views on the strength of the People's case. Prosecutors should try their cases in courtrooms, not in the newspapers, television, or in the movies. As far as we know, no prosecutor has ever been a consultant *Page 869 (even without pay) to a film director on a pending criminal case that he or she is prosecuting. To say that Zonen went too far in his attempt to apprehend petitioner is an understatement. In his zeal to apprehend petitioner so that he could be brought to justice, Zonen virtually gave the entire file, owned by the public, to the filmmakers. This included audiotapes, videotapes, his trial notebook including work product, unredacted police reports, probation reports and psychiatric reports. Zonen also may have unintentionally provided the filmmakers with "rap sheets." We are aware of no authority allowing a public prosecutor to give away, even temporarily, public property, especially when that property contains highly sensitive confidential information in a pending case.
 There are restrictions on what information government employees may disseminate to third persons. (Unauthorized release of criminal records — see §§ 11105, 11140 et seq.; police reports divulging the telephone numbers and addresses of victims or witness — see § 1054.2; probation reports — see § 1203.05.) Perhaps realizing that he had gone too far in cooperating with the filmmakers, Zonen attempted to keep such cooperation secret. The trial court found that Zonen had an understanding with one of the filmmakers, Mehas, that he (Mehas) was not to tell anyone that he was getting materials from Zonen.
 Zonen's conduct may have also created some evidentiary issues which cannot be ignored even at this juncture. For example, by disclosing his "work product" to third parties, he may have waived the right to confidentiality of his impressions of the strengths and weaknesses of the case.
 Unlike the situation in Haraguchi where the prosecutor was motivated by a desire for literary fame and fortune, here Zonen gets high marks for his zeal in attempting to bring petitioner to justice. This is consistent with his oath as a prosecutor. The manner in which he went about achieving his goal, however, is quite another matter.
 As was the case in Haraguchi, our considered judgment is that justice would not be served if Zonen remains as the trial prosecutor. Phrased otherwise, in this situation, there is a likelihood that petitioner will not receive fair treatment if Zonen remains as the trial prosecutor. (People v. Eubanks (1996) 14 Cal.4th 580,592 [59 Cal.Rptr.2d 200, 927 P.2d 310]; People v.Vasquez (2006) 39 Cal.4th 47 [45 Cal.Rptr.3d 372,137 P.3d 199].) We make one further observation: Even a cursory reading of the appellate reports has taught us that death penalty cases are subject to multiple reviews by state and federal courts with various courts often taking a "new" view of the matter. It should be the goal of any prosecutor to try the case once with as few appellate issues preserved for review as possible. (SeeHaraguchi, supra, *Page 870 143 Cal.App.4th at pp. 853-854.) An appellate ruling at this juncture leaving Zonen in the case might well be a basis for reversal in the future. As we indicated inPeople v. Winslow (1995) 40 Cal.App.4th 680, 683
[46 Cal.Rptr.2d 901], "As the moving party in a criminal action, it is the People's obligation . . . [to see that the trial is conducted in a manner] so that a lawful determination can be made and sustained on appeal." Leaving Zonen in the case is ill considered when the stakes are so high. We see no real prejudice to the People beyond bringing another prosecutor up to speed.
 Why We Do Not Order Recusal of theEntire Office As indicated earlier, petitioner seeks to have the entire office recused "based on the lack of evidence that [the District Attorney] was unaware of the prosecutor's [Zonen's] disqualifying conduct." This is a novel approach to the concept of who has the burden of proof. (See Love v.Superior Court (1980) 111 Cal.App.3d 367
[168 Cal.Rptr. 577] [burden on defendant to show recusal is necessary].) Both in writing and at oral argument, petitioner has argued that the elected District Attorney "had to have known" or "must have known," and therefore condoned Zonen's conduct. This is speculative. The record does not contain any declaration from the former elected District Attorney[5] and there is no showing that he refused to provide a declaration at petitioner's request. In some instances, writ petitions are significant for what they omit as some counsel believe, as a matter of tactics, that it is better to argue from a silent record. In our view, the instant writ petition suffers from such an omission. Even if it could be shown that the former elected District Attorney was aware of the cooperation and the specifics thereof, it does not logically follow that the entire office should be recused. To secure such an order, the showing must be "especially persuasive." (People v. Hamilton
(1988) 46 Cal.3d 123, 139 [249 Cal.Rptr. 320, 756 P.2d 1348].) We presume that in death penalty cases, it is the ultimate decision of the elected District Attorney to seek such penalty. Here, this decision was made before Zonen became a film consultant. To be sure, it may be reconsidered by the newly elected District Attorney of Santa Barbara County. Of course, we express no opinion on what penalty should be sought. Here we just do not see the "especially persuasive" showing of a causal connection between Zonen's conduct, the former elected District Attorney, and the remainder of the deputies in that office. *Page 871 
 Conclusion To the extent that petitioner seeks the recusal of prosecutor Zonen, the petition is granted. In all other respects, the petition is denied. The stay order previously issued is vacated.
 Perren, J., concurred.
[1] One of the reasons we originally denied the petition was because it prayed for recusal of the entire district attorney's office.
[2] All statutory references are to the Penal Code unless otherwise stated.
[3] Cassavetes also declared that he did discuss the case with sheriff's deputies but they ". . . did not help me much. They tended to be more closed mouthed. They stated they did not want to compromise any future case." If only Zonen had entertained a similar view.
[4] According to Zonen, "[t]he television program `America's Most Wanted' featured [petitioner] on nine of its shows between 2000 and 2003." Zonen assisted "the producers of . . . `America's Most Wanted' by giving them information about the crime in the hope that the publicity would result in [petitioner's] apprehension."
[5] At an election held on June 6, 2006, a new District Attorney was elected to a four-year term.