Filed 6/30/14  P. v. Mesiti CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Appellant,<br><br>          v.<br><br>MARK EDWARD MESITI,<br><br>     Defendant and Respondent. | F068016<br><br>(Super. Ct. No. 1403298 )<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  John D. Freeland, Judge.

Birgit Fladager, District Attorney, Carol Shipley, Assistant District Attorney, John R. Mayne and Meghan Greerty, Deputy District Attorney, for Plaintiff and Appellant.

Heather MacKay, under appointment by the Court of Appeal, for Defendant and Respondent.

-ooOoo-

## INTRODUCTION

Respondent Mark Edward Mesiti has been charged with murdering his 14-year-old daughter, Alycia Mesiti, during a sexual assault that occurred on or about August 16, 2006.[1] This People's appeal follows grant of Mesiti's motion to recuse the lead prosecutor in the case, Stanislaus County Deputy District Attorney Annette Rees.[2] Having carefully examined the record, we conclude that the trial court's ruling cannot be upheld as a reasonable decision correctly applying the applicable legal standard. The order granting the recusal motion will be reversed.

## FACTS

**A. Prosecution of Gregory Ulrich for lewd conduct involving Alycia.**

During 2005, Mesiti owned a computer-related business and Ulrich worked for him. The business was operated inside a modular home where Mesiti and Alycia resided. Ulrich had previously been convicted of violating Penal Code[3] section 647.6 and was required to register pursuant to section 290.

---

[1] Ceres Police Detective Keith Griebel declared in an affidavit supporting the People's request for an order setting bail in excess of scheduled amount that Alycia was reported as a runaway on August 15, 2006. Two and a half years later, her body was found buried in the backyard of a residence where she lived with Mesiti. Detective Griebel also declared that Mesiti admitted burying Alycia and that Mesiti's computer contained evidence that he sexually assaulted Alycia several different times while she was apparently unconscious. Detective Griebel averred that after Alycia disappeared, Mesiti moved to the Los Angeles area and was involved in crimes that include methamphetamine manufacturing and identity theft.

[2] This appeal is authorized by Penal Code sections 1424, subdivision (a)(2) and 1238, subdivision (11).

[3] All further statutory references are to the Penal Code unless otherwise indicated.

On August 29, 2005, Alycia told Mesiti that Ulrich exposed himself to her, masturbated and attempted to meet her privately. Mesiti called the police and Stanislaus County Deputy Sheriff Joe Mendonza responded to the call. Mesiti gave Deputy Mendonza a note that Ulrich wrote to Alycia asking if she wanted to watch him masturbate.

After speaking with Alycia, Deputy Mendonza arranged for her to be interviewed later that day at the Stanislaus County CAIRE Center (Alycia's CAIRE interview). At that time three assistant district attorneys staffed the Stanislaus County District Attorney's Office Crimes Against Children Unit: Rees, Elaine Casillas-Franco and Nate Baker.[4] It was established practice for one of these attorneys to monitor CAIRE interviews when possible. The attorney who monitored a CAIRE interview was not necessarily assigned the victim's case, if one was filed.

Deputy Mendonza prepared a seven-page narrative report after Alycia's CAIRE interview was complete (the report).[5] The report reflects that "Detective Valente" questioned Alycia. In a nearby room, Deputy Mendonza, Rees, "Lillian" from "victim assistance" and "Lulu" from the Haven Center monitored Alycia's CAIRE interview. Mesiti was not in the interview room or the monitoring room. Other than noting that Rees was present in the monitoring room, Rees is not mentioned again in the report or in any other document related to the investigation or prosecution of Ulrich.

---

[4]     Baker died during 2010.

[5]     The report is the only contemporaneous record documenting Alycia's CAIRE interview. The report was not introduced into evidence below and the appellate record does not contain a copy of it. Information concerning the report's contents is derived from Deputy Mendonza's testimony at the evidentiary hearing. Although Alycia's CAIRE interview was videotaped, the videotape was destroyed four months before the recusal motion was filed. The People produced a copy of the destruction log to the defense as part of its discovery in this case.

With Mesiti's cooperation, Deputy Mendonza drafted an affidavit in support of a search warrant for Ulrich's residence. The warrant was issued and the residence was searched on September 9, 2005. Ulrich was arrested when officers found pornographic photographs depicting Alycia and him.

Casillas-Franco reviewed the case against Ulrich for issuance and, on September 13, 2005, she prepared and filed a two-count complaint in Superior Court of Stanislaus County case No. 1097829 (case No. 1097829). Baker handled the case post-filing. The case was not assigned to Rees at any point in time. A negotiated plea agreement was quickly reached. During Ulrich's initial court appearance on September 16, 2005, he pled guilty to a violation of section 647.6, subdivision (a) and the other count was dismissed. Ulrich was sentenced to 365 days in jail; a two-year prison sentence was suspended. At some point, Ulrich's probationary period was reduced "due to him having terminal cancer."[6]

The district attorney's office file in case No. 1097829 (the case file) contains notes written by Baker. It does not contain any notes written by Rees. There is no indication in the case file that Rees participated in the investigation after the CAIRE interview or in the prosecution. Nothing in the case file indicates that Baker spoke to Rees about the investigation or prosecution. There is also no indication in the case file that Rees communicated with Mesiti at any point in time. The case file does not contain any indication that Mesiti contacted the district attorney's office.

## B.    Charges pending against Mesiti.

During 2009, a complaint was filed charging Mesiti with sexually assaulting and murdering Alycia. Amended complaints were filed in 2011 and 2012 adding special

---

[6]    The appellate record does not indicate if Ulrich has passed away.

circumstances allegations to the murder charge and alleging additional sexual offense charges. The death penalty is being sought. The second amended complaint alleges that between July 2005 and August 2006 Mesiti committed 44 sexual offenses upon Alycia and that, on or about August 16, 2006, he murdered her during the course of a sexual assault. It also alleges that Mesiti sexually assaulted other girls from July 2006 to July 2008. Appellant entered a plea of not guilty to all charges.

The amended complaints were signed by Rees. She first appeared in court for the People at the arraignment on the first amended complaint. A preliminary hearing has not yet been held.

## C. The recusal motion, opposition and declarations.

On July 10, 2013, Mesiti filed the motion to recuse Rees that is at issue here. He did not seek to recuse the entire Stanislaus County Office of the District Attorney. In supporting points and authorities, Mesiti asserted that Ulrich murdered Alycia and he intends to call Rees as a trial witness concerning the investigation of Ulrich during August of 2005. Mesiti contends that Rees' status as an intended defense witness creates a conflict of interest necessitating her recusal. Mesiti argues that Rees's testimony would be relevant to show that he "encouraged Ulrich's prosecution, or in the alternative, did not hinder Ulrich's prosecution." Mesiti reasons that he "would not call attention to his daughter's case and risk exposing himself to criminal charges if the charges and facts supporting the charges against him were true."

The recusal motion is supported by Mesiti's affidavit and supplemental affidavit. As set forth in more detail *post*, Mesiti declared that: (1) Rees personally questioned Alycia during her CAIRE interview; (2) Rees met with Mesiti and Deputy Mendonza after Alycia's CAIRE interview; (3) during this meeting Rees argued with Mesiti and expressed a reluctance to prosecute Ulrich; (4) Rees had several additional conversations with Mesiti and Deputy Mendonza during which Rees expressed a reluctance to

5.

prosecute Ulrich; (5) Rees demanded that Alycia participate in a planned "sting" of Ulrich at a park as a condition of filing charges; and (6) Rees subsequently demanded that Alycia identify herself in a photograph as a condition of filing charges against Ulrich.

In his affidavit, Mesiti declared that Rees was present in the interview room with Alycia during the CAIRE interview and personally questioned Alycia. Rees and Detective Mendonza met with him immediately after the CAIRE interview. Rees said that "she participated in Alycia's interview; had also talked with her; and reviewed [Deputy Mendonza's] information." Rees also said that she ordinarily did not meet with parents at CAIRE interviews and would not "be doing this had I not been told it was urgent." Then Rees said that "she did not think there was sufficient evidence for a prosecution of [Ulrich], and raised the possibility [Ulrich's] actions could have been unintended." Mesiti and Rees "exchanged slightly heated words" after Rees said that Ulrich's conduct was insufficient to justify the filing of charges. Detective Mendonza "intervened to end the issue; by saying Ms. Rees misspoke not meaning it the way it sounded." Detective Mendonza was not "able to convince Ms. Rees a prosecutable crime had been committed."

Mesiti declared that he spoke with Alycia after the meeting with Rees and Deputy Mendonza concluded. Alycia said that the CAIRE interview was "fine" until Rees entered the room and asked her questions. Alycia said that Rees "was mean, and would not listen to what she had to say." Mesiti declared that Alycia said that "she was upset by Ms. Rees, not believing her and did not like her, I told her I had the exact same opinion of Ms. Rees."

Mesiti declared that Deputy Mendonza subsequently told him that "he was disappointed by Rees" and that Rees refused to file charges against Ulrich unless Alycia participated in a "sting" operation to lure Ulrich to a park. In another conversation,

Deputy Mendonza told Mesiti that Rees would not file charges unless Alycia identified herself in photographs found in Ulrich's residence. Mesiti refused to allow Alycia to participate in either proposed course of conduct. Mesiti called Rees to express his opposition to her request that Alycia identify herself in photographs. Mesiti subsequently telephoned Rees on an unspecified number of occasions and left voicemails but Rees never returned his calls.

In this affidavit Mesiti made additional averments that appear primarily designed to further the defense theory that Ulrich murdered Alycia. Mesiti declared that Deputy Mendonza told him that "other victims (23) had been discovered, and [Ulrich] would be charged for those and other crimes separately." Deputy Mendonza "warned me [Ulrich] had a history of returning to his victim in previous cases." The day after Deputy Mendonza made these statements, one of Mesiti's employees telephoned Mesiti and said that he saw Ulrich in Turlock getting a haircut. When the employee approached Ulrich, he ran out the back door. Mesiti declared:

> "I called [Deputy Mendonza], who was equally shocked, believing [Ulrich] still had yet to be sentenced[.] He quickly confirmed [Ulrich] was out on a stay of execution; unknown to me was that a different DA was given the case, and his court date moved up. I was shocked that I was never contacted upon calling the new DA, I learned Annette Rees had told her Alycia and I did not want to participate in his prosecution, and was ok with him pleading out. She said this was why she never contacted us. I said that was not entirely accurate, and showed I have been contacted considering his history of going after his victims. She said she knew nothing about the other prosecution of [Ulrich] involving other victims, she had been asked to handle my daughter case only, since it was [a] plea deal."[7]

_____

[7] We note that Mesiti averred that he spoke with an unnamed female prosecutor (other than Rees) who was handling Ulrich's case. Yet, the case file and testimony of Casillas-Franco prove that Baker, who is a male, prosecuted the case after the complaint was filed. Both Rees and Casillas-Franco testified that they do not have any recollection

7.

Mesiti filed a supplemental affidavit averring that he telephoned Rees twice shortly after Alycia's CAIRE interview. During these conversations Mesiti told Rees that Ulrich was living with a 14-year-old girl and that he discovered digital pictures of Ulrich "stalking minor females" on computers to which Ulrich had unsupervised access. Mesiti declared that "[i]t was arranged that [Deputy Mendonza] would obtain the evidence from these computers." Mesiti wrote that Rees' attitude was "non-committal and complacent about the information provided."

Appellant and the Attorney General's Office opposed the recusal motion.

Rees filed an affidavit declaring that she did not have any recollection of attending Alycia's CAIRE interview or having a conversation with Mesiti "in 2005 or any other time." Rees did not file the case against Ulrich and never appeared on it. She reviewed the case file and her handwriting does not appear in it.

## D. Testimony at the evidentiary hearing.

The court held an evidentiary hearing to receive testimony relevant to the recusal motion.

### 1. Deputy Mendonza's testimony.

Deputy Mendonza testified that he would have documented it in his report if Rees had entered the interview room or asked Alycia any questions. Deputy Mendonza met with Mesiti after Alycia's CAIRE interview. He did not document Rees as being present during that conversation. Mesiti telephoned him approximately five times after the CAIRE interview. Mesiti wanted Ulrich prosecuted. Deputy Mendonza does not recall talking to Rees about the photograph of Alycia that was found during a search of Ulrich's residence. Deputy Mendonza did not tell Mesiti that he was disappointed in Rees' actions

of ever speaking with Mesiti. It would have been easy for Mesiti to wrongly assume that Casillas-Franco prosecuted the case because she filed the complaint.

8.

and attitude in this case. He did not tell Mesiti that Rees said that Alycia needed to participate in a sting operation to arrest Ulrich in a park or identify herself in a photograph. Such a sting operation would have been against sheriff's office policy because it would have put Alycia at risk.

### 2. Casillas-Franco's testimony.

Casillas-Franco testified that she has not had any personal contact or conversations with Mesiti. She did not speak with Rees about Alycia's CAIRE interview. Casillas-Franco also testified that prosecutors do not participate in CAIRE interviews; the prosecutor's role is to be an observer. It would have been against office policy for Rees to have participated in Alycia's CAIRE interview. Which prosecutor attends a CAIRE interview is based on availability. Attending a CAIRE interview does not indicate that the case will be assigned to that prosecutor. It is common for one prosecutor to attend a CAIRE interview and a different prosecutor to issue a complaint. It is office policy for prosecutors to have a third person present when they speak with a witness. It is also office policy to make a note documenting any contact that occurs with the victim's family. It is not office policy to contact the victim's family before reaching a disposition in a case. Casillas-Franco is familiar with Rees' handwriting and it does not appear anywhere in the case file.

### 3. Rees' Testimony

Rees testified that she has no recollection of attending Alycia's CAIRE interview. Detective Mendonza's report "is the only thing that tells me I was there." Rees has attended 300 to 400 CAIRE interviews since 2005. It is not customary for prosecutors in the Crimes Against Children unit to speak with victims or parents during CAIRE interviews. She has no recollection of ever speaking to Mesiti.

**4.      Mesiti's testimony.**

Mesiti's testimony was largely consistent with his affidavits.  Mesiti said that in addition to meeting with Rees and Deputy Mendonza after Alycia's CAIRE interview, he spoke with Rees on four or five separate occasions.

**E.      The trial court's factual findings and ruling.**

The trial court orally granted the recusal motion after argument by counsel.  The court made credibility findings and articulated a lengthy rationale for this decision.  First, the court found "it unlikely that a conversation [between Mesiti and Rees after the CAIRE interview] took place, based on all the evidence."  The court also found:  "I think there's a lot of questions about the testimony that Mr. Mesiti provided that [the prosecutor] has pointed out, and several things that this Court has considered and finds the testimony of Mr. Mesiti not entirely convincing."

Next, the trial court stated that the content of the conversations between Mesiti and Rees would be offered at trial for the non-hearsay purpose of showing Mesiti's state of mind and conduct.  Therefore, in the court's view "it is immaterial whether the trial judge believes the party's evidence.  The admissibility of evidence does not depend on its weight or persuasiveness."  The court continued,

> "it doesn't matter what this Court determines or finds as to whether Mr. Mesiti's testimony today is credible or not.  The issue before the Court is one of admissibility, not truth or falsity.  Since it is admissible, because it is probative, the Deputy District Attorney's alleged comments will be before the trier of fact before trial.  [¶]  Given this finding, this Court does not believe, today, that [it] can exclude the evidence under Evidence Code §352.  This means that even though the Deputy District Attorney will merely deny any recollection of the events, her credibility will be at issue and on a very significant issue in the case."

The trial court stated that it "believes that the defense will attack Deputy District Attorney Rees' credibility by including her handling of the [Ulrich] matter[.]  [The

10.

defense] may argue her failure to document her involvement, her failure to recognize the significant risk to Alycia and other children by Greg Ulrich." Therefore, "the Court finds that there's a reasonable possibility Ms. Rees prosecutorial discretion will be compromised, thus presenting a conflict in a continual prosecution of this case, because she may not exercise it in an even-handed manner."

Finally, the trial court concluded that there exists a likelihood that defendant would be treated unfairly during some portion of the criminal proceeding, reasoning:

> "because Ms. Rees as a trial prosecutor will spend numerous days in front of the jury making impressions on that jury as to her character. It is not uncommon for jurors to develop attitudes towards the lawyers, both good and bad. There is no way to accurately predict which it might be. [¶] But imagine a situation where Ms. Rees is well-received by the jurors, and the jurors decide they like her professionalism and the handling of the case and the trial. Suddenly, when the Defense case begins, she is attacked by the Defense Counsel. At that point, the ability of the jurors -- the ability of the jurors to divorce their previous impressions of Ms. Rees and judge her credibility anew is a task almost no person could perform."

At the joint request of counsel, the recusal order was stayed pending appellate review.

## DISCUSSION

**A.  Governing legal standards.**

"Section 1424 sets out the standard governing motions to recuse a prosecutor." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 (*Haraguchi*).)[8] A recusal "motion 'may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.' [Citation.]"

---

[8]     The trial court conducted an evidentiary hearing and the People do not argue that the decision to hold this hearing was erroneous. Therefore, it is not necessary to discuss the two-stage process prescribed by section 1424 consisting of written submissions followed by an evidentiary hearing when warranted.

(*Ibid.*)  Section 1424 "'articulates a two-part test: "(1) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?"'" [Citations.]" (*Haraguchi*, *supra,* at p. 711.)  "The statute demands a showing of a real, not merely apparent, potential for unfair treatment, and further requires that that potential 'rise to the level of a *likelihood* of unfairness.'  [Citation.]" (*People v. Vasquez* (2006) 39 Cal.4th 47, 56.)  Although section 1424 refers to a fair trial, decisions have "interpreted section 1424 as requiring recusal on a showing of a conflict of interest "'so grave as to render it unlikely that defendant will receive fair treatment *during all portions of the criminal proceedings*."'  [Citations.]" (*Vasquez, supra,* at p. 56.)

A conflict of interest within the meaning of section 1424 "exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.  Thus, there is no need to determine whether a conflict is 'actual,' or only gives an 'appearance' of conflict." (*People v. Conner* (1983) 34 Cal.3d 141, 148.)  It is not enough to show that the prosecutor's involvement "would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system." (*People v. Eubanks* (1996) 14 Cal.4th 580, 592.)  A conflict of interest exists when the prosecutor is shown to have a personal animus against the defendant that is so significant that it creates a reasonable possibility that he or she will not exercise prosecutorial discretion in an evenhanded manner. (*Id*. at p. 590; *Conner, supra*, 34 Cal.3d at p. 148.)  To warrant recusal, the defendant must demonstrate that the prosecutor's personal interest in obtaining a conviction is more than an advocate's usual interest in prevailing.  Where indications of personal animus or biased judgment are slight and do not amount to a reasonable possibility of unfairness, recusal may be denied.  (See, e.g., *People v. Municipal Court* (*Henry*) (1979) 98 Cal.App.3d 690, 693; *People v. Battin* (1978) 77 Cal.App.3d 635, 672.)

12.

Proof of conflict alone is not sufficient to justify recusal of the prosecutor. Recusal to prevent the possibility of unfairness is not permitted. Section 1424 authorizes recusal only when the defendant shows that the conflict of interest is "'""so grave as to render it unlikely that defendant will receive fair treatment *during all portions of the criminal proceedings*."'" [Citations.]" (*People v. Vasquez, supra*, 39 Cal.4th at p. 56.)

"[A] motion to recuse is directed to the sound discretion of the trial court, and its decision to grant or deny the motion is reviewed only for an abuse of discretion. [Citations.] The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi, supra*, 43 Cal.4th at pp. 711-712, fns. omitted.)

## B.    The trial court's credibility findings are supported by substantial evidence.

The trial court made credibility findings as part of its ruling. It found that it was "unlikely that a conversation [between Mesiti and Rees after Alycia's CAIRE interview] took place, based on all the evidence." The court continued: "I think there's a lot of questions about the testimony that Mr. Mesiti provided that [the prosecutor] has pointed out, and several things that this Court has considered and finds the testimony of Mr. Mesiti not entirely convincing."

When ruling on a recusal motion, the trial court bears the responsibility of assessing the credibility of evidence before it. Appellate courts do not serve as initial fact finders; this is the trial court's responsibility and function. Factual findings are reviewed under the deferential substantial evidence standard. (*People v. Vasquez, supra*, 39 Cal.4th at p. 56.) When applying this standard, we view the entire record in the light most favorable to the judgment below to determine whether it contains evidence which is reasonable, credible, and of solid value supporting the contested finding. Substantial

13.

evidence includes circumstantial evidence and any reasonable inferences that may be drawn from that evidence. (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.)

In this case, the great weight of the evidence supports the trial court's findings that Mesiti was not a credible witness. Rees testified that she did not have any recollection of ever speaking with Mesiti. Deputy Mendonza testified that he spoke with Mesiti after Alycia's CAIRE interview. Deputy Mendonza's report does not indicate that Rees was present during this meeting. There are no indications in the case file that Rees had any involvement in the investigation or prosecution of Ulrich. There is no indication in the case file that Rees and Mesiti communicated at any point in time. There are no notes in the case file showing that Mesiti contacted the district attorney's office about the Ulrich matter. Nothing in the case file indicates that Baker spoke to Rees about the investigation or prosecution. Casillas-Franco testified that attendance at a CAIRE interview is determined by availability and cases are not assigned to a prosecutor based on attendance at a CAIRE interview. Therefore, we uphold the trial court's factual findings.

## C. The credibility findings are relevant to the determination whether there was a conflict of interest.

After making factual findings in favor of appellant, the trial court concluded, as a matter of law, that its findings about Mesiti's lack of credibility were irrelevant. The trial court said, "it is immaterial whether the trial judge believes the party's evidence. [¶] … [I]t doesn't matter what this Court determines or finds as to whether Mr. Mesiti's testimony today is credible or not." In so doing, the trial court prejudicially erred.

Mesiti's credibility was directly relevant to the question whether there existed a conflict of interest between Rees and Mesiti. The trial court's role in a recusal motion includes making factual findings where the evidence of conflict is disputed. (See, e.g., *People v. Vasquez, supra*, 39 Cal.4th at pp. 56-57.) Its first duty under the applicable standard is to determine if there is a conflict of interest. In this case, a conflict of interest

exists only if Mesiti's averments and testimony about Rees' statements and conduct are true. If Mesiti's statements about Rees' supposed conversations with him and Deputy Mendonza are false, then no conflict of interest exists. There is no evidence apart from Mesiti's testimony and averments tending to show that Rees spoke with Mesiti or participated in either the investigation or prosecution of Ulrich (other than monitoring Alycia's CAIRE interview). Consequently, the trial court's assessment of Mesiti's credibility is crucial. When the trial court found that it was "unlikely" that Mesiti and Rees spoke after Alycia's CAIRE interview and that Mesiti's testimony was not "entirely convincing," these factual findings needed to be applied to the first step of the section 1424 standard, namely, whether there is a conflict of interest between Rees and Mesiti.

The trial court's legal conclusion that "it is immaterial whether the trial judge believes the party's evidence" is incorrect. The trial court erred by basing its determination that there existed a conflict of interest between Mesiti and Rees on testimony that it found was not credible. The trial court's factual findings resolved the question whether there existed a conflict of interest adverse to Mesiti's position. No conversation or meeting occurred between Rees and Mesiti. There was no evidence Rees had any personal animosity against Mesiti. Therefore, Mesiti failed to satisfy his burden of showing the existence of a conflict of interest.[9]

**D.     The decision granting the recusal motion was not a reasonable exercise of judicial discretion applying the proper legal standard.**

"The discretion of a trial court is, of course, '"subject to the limitations of legal principles governing the subject of its action."'" (*People v. Eubanks, supra*, 14 Cal.4th at p. 595, quoted in *Haraguchi, supra*, 43 Cal.4th at p. 712, fn. 4.) "The trial court does not

---

[9]     Issues surrounding potential admissibility at trial of testimony about the investigation and prosecution of Ulrich are properly decided at that time.

have discretion to depart from legal standards." (*People v. Neely* (1999) 70 Cal.App.4th 767, 776, quoted in *Haraguchi, supra*, 43 Cal.4th at p. 712, fn. 4.) The trial court's ruling was based, in part, on the legal conclusion that it was irrelevant whether or not Mesiti's testimony and declaratory evidence was credible and believable. The trial court's reasoning is premised on the assumption that a successful recusal motion can be based on evidence that the trial court has determined is unconvincing and unbelievable. We have explained that this premise is erroneous as a matter of law. The trial court's factual findings are relevant and Mesiti did not satisfy his burden of establishing the existence of a conflict of interest. Therefore, the order granting the recusal motion must be reversed.

## DISPOSITION

The order dated August 13, 2013, granting the motion to recuse Deputy District Attorney Annette Rees pursuant to Penal Code section 1424 is reversed.

_____

LEVY, Acting P.J.

WE CONCUR:


_____

DETJEN, J.


_____

FRANSON, J.

16.